# No. 11-17858

———————————————————

# UNITED STATES COURT OF APPEALS
## FOR THE
# NINTH CIRCUIT

———————————————————

JOHN DARIANO, DIANNA DARIANO, ON BEHALF OF THEIR MINOR CHILD, M.D.; KURT FAGERSTROM, JULIE ANN FAGERSTROM, ON BEHALF OF THEIR MINOR CHILD, D.M.; KENDALL JONES, AND JOY JONES, ON BEHALF OF THEIR MINOR CHILD, D.G.,

*Plaintiffs-Appellants,*

**V.**

MORGAN HILL UNIFIED SCHOOL DISTRICT; NICK BODEN, IN HIS OFFICIAL CAPACITY AS PRINCIPAL, LIVE OAK HIGH SCHOOL; AND MIGUEL RODRIGUEZ, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY AS ASSISTANT PRINCIPAL, LIVE OAK HIGH SCHOOL,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
HONORABLE JAMES WARE
Case No. CV10-02745 JW

———————————————————————————————————————

## APPELLANTS' BRIEF

———————————————————————————————————————

WILLIAM J. BECKER, JR., ESQ.
THE BECKER LAW FIRM
11500 OLYMPIC BLVD., STE. 400
LOS ANGELES, CA 90064
(310) 636-1018
*Affiliated Attorney with The Rutherford Institute*
*and the Thomas More Law Center*

ROBERT J. MUISE, ESQ.
AMERICAN FREEDOM LAW CENTER
P.O. BOX 131098
ANN ARBOR, MI 48113
(734) 635-3756

ERIN MERSINO, ESQ.
THOMAS MORE LAW CENTER
24 FRANK LLOYD WRIGHT DRIVE
P.O. BOX 393
ANN ARBOR, MI 48106
(734) 827-2001

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF JURISDICTION ...................................................... 1

PRELIMINARY STATEMENT ............................................................ 2

STATEMENT OF THE ISSUES ........................................................... 6

STATEMENT OF THE CASE .............................................................. 7

STATEMENT OF FACTS ................................................................... 8

    I.     Defendants Restricted Plaintiffs' Patriotic Clothing Based on
          Its Message ............................................................................ 8

    II.    Plaintiffs' Message-Bearing Clothing Caused <u>No</u> Disruption .............. 13

    III.   Defendant Rodriguez Willingly Restricted Plaintiffs' Freedom
          of Speech ............................................................................. 16

    IV.   The 2009 Incident Did Not Justify the Speech Restriction ................... 16

    V.    School District Policy and "Guidelines" Authorized the Speech
          Restriction............................................................................. 19

SUMMARY OF THE ARGUMENT ................................................... 26

ARGUMENT ................................................................................. 28

    I.     Standard of Review .............................................................. 28

    II.    Defendants' Speech Restriction Violated the First Amendment .......... 29

          A.    Defendants Restricted Plaintiffs' Speech Based on
                Its Message.................................................................. 29

      B.   *Tinker* Compels Reversal Below ................................................. 33

III.   Defendants' Speech Restriction Violated the California Constitution ......................................................................... 38

IV.   Defendants' Speech Restriction Violated the Equal Protection Clause ....................................................................... 38

V.   The School District's Speech Restriction "Guidelines" Violate Due Process ................................................................ 39

VI.   Declaratory and Injunctive Relief Against the School District Are Justified .......................................................... 42

CONCLUSION .................................................................... 46

STATEMENT OF RELATED CASES ........................................... 46

CERTIFICATE OF COMPLIANCE .............................................. 47

CERTIFICATE OF SERVICE ..................................................... 48

# TABLE OF AUTHORITIES

## Cases

*Abington Sch. Dist. v. Schempp*,
   374 U.S. 203 (1963) ........................................ 4

*Adarand Constructors, Inc. v. Slater*,
   528 U.S. 216 (2000) .................................. 43, 44

*A.M. v. Cash*,
   585 F.3d 214 (5th Cir. 2009) ............................ 37

*Ambach v. Norwick*,
   441 U.S. 68 (1979) ...................................... 4

*Barr v. Lafon*,
   538 F.3d 554 (6th Cir. 2008) ......................... 2, 37

*Bethel Sch. Dist. No. 403 v. Fraser*,
   478 U.S. 675 (1986) .................................... 34

*Bose Corp. v. Consumers Union of United States, Inc.*,
   466 U.S. 485 (1984) .................................... 28

*Boos v. Barry*,
   485 U.S. 312 (1988) .................................... 31

*Brandon v. Holt*,
   469 U.S. 464 (1985) .................................... 43

*Cal. Teachers Ass'n v. Governing Bd. of San Diego Unified Sch. Dist.*,
   45 Cal. App. 4th 1383 (1996) ........................... 38

*Carey v. Brown*,
   447 U.S. 455 (1980) .................................... 38

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
   470 F.3d 1062 (4th Cir. 2006) .......................... 40

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) ........................................................................... 41

*City of Mesquite v. Aladdin's Castle, Inc.*,
    455 U.S. 283 (1982) ........................................................................... 44

*Cogswell v. City of Seattle*,
    347 F.3d 809 (9th Cir. 2003) ............................................................ 32

*Cohen v. Cal.*,
    403 U.S. 15 (1971) ..................................................................... 30, 31

*Consol. Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*,
    447 U.S. 530 (1980) ........................................................................... 29

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
    473 U.S. 788 (1985) ........................................................................... 32

*Ctr. For Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*,
    533 F.3d 780 (9th Cir. 2008) ............................................................ 32

*Defoe ex rel. Defoe v. Spiva*,
    625 F.3d 324 (6th Cir. 2010) .............................................................. 2

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ........................................................................... 30

*Ex Parte Young*,
    209 U.S. 123 (1908) ........................................................................... 43

*Flint v. Dennison*,
    488 F.3d 816 (9th Cir. 2007) ............................................................ 43

*Forsyth Cnty. v Nationalist Movement*,
    505 U.S. 123 (1992) ..................................................................... 31, 41

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ..................................................................... 39, 40

*Hills v. Scottsdale Unified Sch. Dist. No. 48*
   329 F.3d 1044 (9th Cir. 2003) ............................................................. 4

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
   515 U.S. 557 (1995) ....................................................................... 28

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ....................................................................... 43

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
   385 U.S. 589 (1967) ....................................................................... 36

*Lewis v Wilson*,
   253 F3d 1077 (8th Cir. 2001) ........................................................ 31

*McCollum v. Bd. of Educ.*,
   333 U.S. 203 (1948) ......................................................................... 3

*Police Dept. of the City of Chicago v. Mosley*,
   408 U.S. 92 (1972) ......................................................................... 38

*Porter v. Cal. Dept. of Corrections*,
   383 F.3d 1018 (9th Cir. 2004) ........................................................ 28

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ....................................................................... 30

*Robins v. Pruneyard Shopping Ctr.*,
   23 Cal. 3d 899 (1979) ..................................................................... 38

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ................................................................. 30, 32

*Rounds v. Oregon State Bd. of Higher Educ.*,
   166 F.3d 1032 (9th Cir. 1999) ........................................................ 43

*Scott v. Sch. Bd. of Alachua Cnty.*,
   324 F.3d 1246 (11th Cir. 2003) ........................................................ 2

*Snyder v. Phelps*,
    131 S. Ct. 1207 (2011) ....................................................................... 31

*Street v. N.Y.*,
    394 US 576 (1969) ............................................................................ 30

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ................................................................. *passim*

*Tx. v. Johnson,*
    491 U.S. 397 (1989) ............................................................... 3, 29, 30

*United States v. W.T. Grant Co.,*
    345 U.S. 629 (1953) ...................................................................43, 44

*West v. Derby Unified Sch. Dist.*
    No. 260 F.3d 1358 (10th Cir. 2000) ................................................. 2

*W.V. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ........................................................................ 5

## Statutes

28 U.S.C. §1291   ................................................................................ 1

28 U.S.C. §1331   ................................................................................ 1

28 U.S.C. §1343   ................................................................................ 1

28 U.S.C. §1367(a) ............................................................................. 1

42 U.S.C. § 1983  ............................................................................ 1, 7

## STATEMENT OF JURISDICTION

On June 23, 2010, Plaintiffs filed a Complaint for nominal damages and declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, challenging Defendants' speech restriction under the United States and California Constitutions.   (R-1; ER-247-66; Vol. III [Compl.]).[1]   The district court had jurisdiction of the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and it had supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367(a).

On August 29, 2011, the parties filed cross-motions for summary judgment. (R-53, 54).

On November 8, 2011, the court denied Plaintiffs' motion and granted Defendants' motion as to all claims, (R-67; ER-3-18; Vol. I [Order at 1-16]), and judgment was entered in favor of Defendants, (R-68; ER-1; Vol. I [Judgment]).

On November 22, 2011, Plaintiffs filed a timely Notice of Appeal.  (R-69; ER-20-21; Vol. II [Notice of Appeal]).

This appeal is from a final order and judgment that disposes of all parties' claims.  This court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] "ER" refers to the Appellants' Excerpts of Record.

## PRELIMINARY STATEMENT

This case challenges Defendants' restriction on Plaintiffs' right to express a peaceful and passive patriotic message by wearing t-shirts depicting the American flag on a public high school campus in California.  On May 5, 2010, Defendants prevented Plaintiffs from doing so, in violation of the United States and California Constitutions.

Without exception, the celebration of the American flag should be protected no less than its desecration.  Indeed, it is a poor lesson in American civics to ban the American flag as a polarizing racist pariah when competing symbols of nationhood are at issue.

Unlike the Confederate flag, the American flag is not—and should not—be viewed as a symbol of racism.  Blocking the display of the Confederate flag in a public school, as in the cases relied upon below, is at least nominally justified by the fact that many people view that flag as a symbol of race hatemongering.[2]  No such claim can be made about the American flag in an American public school.

---

[2] In upholding Defendants' ban on the American flag, the district court cited to cases that upheld bans on the Confederate flag in public schools "with a history of racial tensions leading to disturbances."  (R-67; ER-10; Vol. I [Order at 8-9, n. 20 (citing *Barr v. Lafon*, 538 F.3d 554, 567 (6th Cir. 2008) (holding "the connection between the symbolism of the Confederate flag and racial tensions at the school meant that the Confederate flag would likely have a disruptive effect on the school"); *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246 (11th Cir. 2003) (same); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000) (same)]); *see also Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 339 (6th Cir. 2010)

In fact, the American flag symbolizes unity and promotes a public school's goal of providing students opportunities to celebrate their cultural heritages. Proudly overcoming the flames that briefly enveloped it, the history and heritage of our "star spangled banner" has found unanimous Supreme Court respect as the "symbol of nationhood and national unity." *See Tx. v. Johnson*, 491 U.S. 397, 413 (1989); *see also id.* at 427, 429 (Rehnquist, C.J., dissenting) (amplifying the concept); *Id.* at 436 (Stevens, J., dissenting) (adopting the phrase and amplifying the concept). A student's patriotic pride in the flag—and the unity it heralds—does not attack other cultures and should not be discouraged as somehow representing a symbol of divisiveness—let alone violence.

American public schools cannot logically ban the American flag for any duration or reason. Such a ban contradicts the fundamental objectives of our public school system. Indeed, the Supreme Court has repeatedly recognized the role of public education as a unifying social force and the basic tool for shaping democratic values. As noted by the Court, a public school is "the most powerful agency for promoting cohesion among a heterogeneous democratic people . . . at once the symbol of our democracy and the most pervasive means for promoting our common destiny." *McCollum v. Bd. of Educ.*, 333 U.S. 203, 216 (1948).

(Rogers, C.J., concurring) (stating "the Confederate flag on a t-shirt is doubtless *perceived* by many, if not most, student viewers in today's high schools in the United States as a statement of racial hostility—comparable to a slogan that says 'Blacks should be slaves' or 'Blacks are inferior'").

3

Public schools represent "a most vital civic institution for the preservation of a democratic system of government," *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 230 (1963), and are the primary vehicle for transmitting "the values on which our society rests," *Ambach v. Norwick*, 441 U.S. 68, 76 (1979). Thus, public schools should inculcate fundamental values necessary for the maintenance of a democratic political system.

As a result, America's pre-eminent symbol of principled unity and pride—the American flag—should not have to be stowed away in students' lockers on days designated to celebrate the nationalistic pride of any other nation or culture. If these precedents have any practical meaning, then school officials—anticipating any form of discomfort from competing political views—should be prepared to inculcate in their student populations the spirit and magnificence of the First Amendment's place in the shaping of democratic values. *Cf. Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1055 (9th Cir. 2003) (stating that "it is far better to teach students about the First Amendment . . . about why we tolerate divergent views" than to suppress speech and noting that "[t]he school's proper response is to educate the audience rather than squelch the speaker") (internal quotations and citation omitted).

This means respect for the flag, respect for the Nation, and respect for the speech rights of *all* American students. Promoting divisive policies that exalt

hostility to national pride subverts the vital role that public schools are meant to serve, and it undermines—indeed violates—fundamental constitutional principles.

As noted, the Supreme Court has repeatedly acknowledged the public school systems' role as a unifying force—a basic tool for shaping democratic values and cohesion within a culturally and racially diverse student body—and a means for promoting our common destiny.  Defendants' decision to censor the display of the American flag challenges—indeed, it contravenes—that goal.

In *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), the Court spoke directly to the Nation's educators, recalling their mission to teach civics by example:

> That they are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*Id*. at 637.  And consistent with this "scrupulous protection of constitutional freedoms," the Court further emphasized that "[i]f there is any fixed star in our constitutional constellation, it is that *no official*, high or petty, can prescribe what shall be orthodox in politics, *nationalism*, religion, or other matters of opinion." *Id*. at 642 (emphasis added).  Here, when Defendants prohibited Plaintiffs from wearing t-shirts depicting images of the American flag at Live Oak High School on May 5, 2010 (Cinco de Mayo), that "fixed star" in our constitutional constellation was obscured and an official orthodoxy proscribed.

5

In sum, because the decision below does not "scrupulously protect" fundamental constitutional rights, it must be reversed.

## STATEMENT OF THE ISSUES

I.    Whether Defendants' content- and viewpoint-based restriction on Plaintiffs' peaceful, passive, patriotic expression of speech that caused no disruption on their public high school campus violated the First Amendment to the United States Constitution and article I, section 2 of the California Constitution.

II.    Whether Defendants' restriction on Plaintiffs' peaceful, passive, patriotic expression of speech conveying a pro-America viewpoint while permitting other students to engage in speech conveying a pro-Mexico viewpoint violates the Equal Protection Clause of the Fourteenth Amendment.

III.    Whether Defendants' dress code "guidelines," which were the moving force behind the constitutional violations at issue and which contain a broad invitation to subjective and discriminatory enforcement, are facially invalid and/or invalid as to their application to Plaintiffs' peaceful, passive, patriotic expression of their pro-America viewpoint.

IV.    Whether Plaintiffs are entitled to prospective declaratory and injunctive relief to prohibit School District officials from enforcing their unlawful speech restriction.

## STATEMENT OF THE CASE

On June 23, 2010, Plaintiffs filed a Complaint for nominal damages and declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, challenging Defendants' speech restriction under the United States and California Constitutions.  (R-1; ER-247-66; Vol. III [Compl.]).  Specifically, Plaintiffs are challenging Defendants' restriction on their right to peacefully express a patriotic message on their high school campus by wearing t-shirts depicting the American flag.

On September 2, 2010, Defendants moved to dismiss the Complaint for lack of subject matter jurisdiction.  (R-12).  The court granted Defendants' motion in part and denied it in part.  (R-36).  Specifically, the court denied Defendants' request to dismiss Plaintiffs' claims for declaratory and injunctive relief on mootness grounds; it denied Defendants' request to bar Plaintiffs' claims for nominal damages against the individual Defendants on Eleventh Amendment immunity grounds; and it denied Defendants' claim that Plaintiff M.D. lacked standing.  The court granted Defendants' request to dismiss the *parent* plaintiffs' individual claims for the violation of their own First Amendment rights.  (R-36).

On August 29, 2011, the parties filed cross-motions for summary judgment.  (R-53, 54).  During the pendency of these motions, Defendant Nick Boden filed for

bankruptcy. Consequently, the case has been stayed as to the claims against him in his individual capacity. (R-67; ER-3; Vol. I [Order at 1, n.2]).

On November 8, 2011, the court denied Plaintiffs' motion and granted Defendants' motion as to all claims, (R-67; ER-3-18; Vol. I [Order at 1-16]), and judgment was entered in favor of Defendants, (R-68; ER-1; Vol. I [Judgment]).

On November 22, 2011, Plaintiffs filed a timely Notice of Appeal. (R-69; ER-20-21; Vol. II [Notice of Appeal]). This appeal follows.

## STATEMENT OF FACTS

### I. Defendants Restricted Plaintiffs' Patriotic Clothing Based on Its Message.

Plaintiffs are three students who attend Live Oak High School, which is a school within Defendant Morgan Hill Unified School District (hereinafter "School District"). (R-37; ER-462; Vol. III [Answer at ¶¶ 8-10]). On May 5, 2010, Plaintiffs and two other students wore to school various items of clothing (t-shirts, shorts, shoes) which had depictions of the American flag or American-flag like motifs (*i.e.*, stars and stripes).[3] (R-1; ER-251, 260-66; Vol. III [Compl. at ¶ 14, Exs. 1, 2, 3]; R-37; ER-463; Vol. III [Answer at ¶ 14]). That day, some students at the school were celebrating the Mexican holiday known as Cinco de Mayo. *School*

---

[3] This clothing specifically included the t-shirts depicted in Exhibits 1 through 3 attached to the Complaint. (R-1; ER-251, 260-66; Vol. III [Compl. at ¶ 14, Exs. 1, 2, 3]; R-37; ER-463; Vol. III [Answer at ¶ 14 ("Defendants admit that pictures of the T-shirts worn by the student Plaintiffs on May 5, 2010 are attached to the Complaint as Exhibits 1 through 3.")]).

*officials approved the Cinco de Mayo celebration*, which was co-sponsored by

M.E.Ch.A, a school-sanctioned student group.[4]  (R-52; ER-387-89; Vol. III [Boden

Dep. at 25-27 at Ex. 4]).   The students participating in the celebration were

permitted to wear clothing that had the colors of the Mexican flag.  (R-52; ER-406;

Vol. III [Boden Dep. at 57 at Ex. 4 ("Q: Was there any prohibition on any of these

dancers that were engaged in these Cinco de Mayo activities from wearing any

clothing that had colors of the Mexican flag?  A: No.")]; *see also* R-52; ER-352;

Vol. III [Rodriguez Dep. at 117 (acknowledging seeing the Mexican flag painted

on students on May 5, 2010) at Ex. 1)]).

   During the brunch break, and as instructed by the school's Principal,

Defendant Boden, the school's Assistant Principal, Defendant Rodriguez,

approached the Plaintiffs and two other students and directed them to turn their

American flag t-shirts inside out.  (R-37; ER-463-64; Vol. III [Answer at ¶ 20

---

[4] M.E.Ch.A. is an acronym that stands for "movimiento" [movement] "estudiantil" [student] "Chicano" [an ethnic identity] and "Aztlan" [referring to the mythical homeland of the Aztecs].  (R-52; ER-331-33; Vol. III [Rodriguez Dep. at 54-56 at Ex. 1]).  "Chicanismo" is a term that includes as part of its definition "a personal decision to reject assimilation and work towards the preservation of [the Chicano] cultural heritage."  (R-52; ER-357-58; Vol. III [Rodriguez Dep. at 159-60 at Ex. 1]).  In other words, M.E.Ch.A, by its very name, is a student movement that rejects the assimilation of Chicanos into American culture.  (*See also* R-52; ER-360-75; Vol. III [Dep. Ex. 15 at Ex. 2]).  According to the M.E.Ch.A. club's "Charter/Constitution" that was filed with school officials at Live Oak High School, the purpose of the club is, in part, to "support students who have a desire *to keep up their own culture & customs*."  (R-52; ER-377; Vol. III [Club Charter / Constitution at Ex. 3) (emphasis added)]).

("Defendants admit that Defendant Rodriguez spoke with the student Plaintiffs during a morning break and asked them to turn their T-shirts, which included depictions of the American flag, inside out.")]).  Defendants were responding to complaints from some students described by Defendant Rodriguez as "***Mexican American or Mexican students***."[5]  (R-52; ER-392, 402-03; Vol. III [Boden Dep. at 33, 50-51 at Ex. 4]; R-52; ER-330, 333-35, 343-44; Vol. III [Rodriguez Dep. at 50, 56, 57, 59, 90-91 at Ex.1 (emphasis added)]).

When Plaintiffs refused, Defendant Rodriguez directed them to go with him to his office.  Plaintiffs complied.  (R-52; ER-394-400; Vol. III [Boden Dep. at 41-47 at Ex. 4]; R-37; ER-463-64; Vol. III [Answer at ¶ 20]).

Plaintiffs were singled out by Defendants Rodriguez and Boden because they were wearing clothing that depicted the American flag.  (R-52; ER-393-94, 401-02; Vol. III [Boden Dep. at 40, 41 (citing to the red, white, and blue color scheme and "flag implications" of Plaintiffs' clothing); 49-50 (stating that the "depiction of the flag" was "very very large"; that it was "blatant and prominent") at Ex. 4]; R-52; ER-355-56; Vol. III [Rodriguez Dep. at 125-26 at Ex. 1]; R-37; ER-463-64; Vol. III [Answer at ¶ 20]).

---

[5] Indeed, the fact that Defendant Rodriguez referred to the complaining students as "Mexican American or Mexican students" is troubling, and it is indicative of the separatist view that created in his mind—and likely in the mind of Defendant Boden as well—discomfort with having Plaintiffs wear American flag t-shirts in school on Cinco de Mayo.

After receiving a call from her son, Ms. Diana Dariano, the mother of Plaintiff M.D., arrived at the school and addressed the matter with Defendant Rodriguez. Other parents soon arrived, and a meeting was held with Defendant Boden. (R-52; ER-397-98; Vol. III [Boden Dep. at 44-45 at Ex. 4]; R-37; ER-464; Vol. III [Answer at ¶¶ 26, 28]).

During this meeting, Defendants Boden and Rodriguez made it clear that they objected to Plaintiffs' American flag clothing because they believed that its message would offend *Mexican* students on campus *since it was Cinco De Mayo*. (R-52; ER-392; Vol. III [Boden Dep. at 33 (referring to a group of "Mexican" students that were questioning Plaintiffs' American flag clothing), 50-51 ("[T]here was a number of our Hispanic students who had indicated already that they were questioning why [Plaintiffs] were able to [wear their American flag clothing].") at Ex. 4]; R-52; ER-333-34; Vol. III [Rodriguez Dep. at 56-57 ("So these *Mexican* students called me over and they asked me in reference to the boys, part of the . . . plaintiffs and other students in the center of the quad. And their question to me was, why do they get to wear the ***American flag*** when we don't get to wear ***our*** flag?) (emphasis added); 90-91 (admitting that the restriction was based on the ***reaction*** that some students might have to Plaintiffs' flag shirts), *see also* 125-26 at Ex. 1)]). Indeed, one Defendant claimed during this meeting that Plaintiffs' message was objectionable because "***this is their*** [*i.e.,* Mexicans'] ***day***," referring

11

to Cinco De Mayo, "***an important day in*** [*Mexican*] ***culture***."[6]  (R-52; ER-400; Vol. III [Boden Dep. at 47 at Ex. 4]; *see also* R-52; ER-341-42; Vol. III [Rodriguez Dep. at 88-89 ("[*T*]*he fact that it was Cinco de Mayo that day*, *I asked them*, '*Why today out of all days?  Why today?*'") at Ex. 1]).

After being detained for over 90 minutes, Plaintiff M.D. and the two non-plaintiff students were permitted to return to class because, according to Defendant Boden, the depiction of the American flag on their clothing was not as large or as "blatant and prominent" as the flag depictions on the clothing worn by Plaintiffs D.M. and D.G.  (R-52; ER-401-02; Vol. III [Boden Dep. at 49-50 at Ex. 4]; R-52; ER-349-50; Vol. III [Rodriguez Dep. at 111-12 (admitting that "they were allowed to go back because the clothing that they wore ***was not explicitly American flags***") (emphasis added) at Ex. 1]; R-37; ER-464; Vol. III [Answer at ¶ 29 (admitting that Defendant Boden permitted Plaintiff M.D. to return to class after "approximately ninety minutes" without requiring him to turn his shirt inside out)]).  Nevertheless, Ms. Dariano removed her son, Plaintiff M.D., from school because she was concerned that the school was creating a pro-Mexican/anti-American atmosphere and that would subject her son to further discrimination.  (R-26-1; ER-472-73; Vol. III [Dariano Decl. at ¶ 11]; *see also* R-37; ER-465; Vol. III [Answer at ¶ 31]; R-52;

---

[6] According to Defendant Boden, during this meeting he and Defendant Rodriguez "***wanted to make sure also that there was an understanding of the importance, the cultural significance of Cinco De May to our Hispanic students***."  (R-52; ER-398; Vol. III [Boden Dep. at 45 at Ex. 4) (emphasis added)]).

ER-350-351; Vol. III [Rodriguez Dep. at 112-13 (warning the students returning to class to be "respectful" of the Cinco De Mayo activities that were to occur during lunch that day) at Ex. 1]).

Because the depiction of the American flag on the clothing worn by Plaintiffs D.M. and D.G was "very, very large," "blatant and prominent," Defendant Boden directed them to change clothing, turn their shirts inside out, cover them up, or go home. (R-52; ER-402-03, 404; Vol. III; [Boden Dep. at 50-51, 54 at Ex. 4]; R-52; ER-353, 355-56; Vol. III; [Rodriguez Dep. at 120, 125-26 at Ex. 1]; R-37; ER-464-65; Vol. III [Answer at ¶ 30 ("Defendants admit that Defendant Boden told Plaintiffs D.M. and D.G. that they had to turn their T-shirts inside out or leave school for the day. . . .")]). Plaintiffs refused to change or remove their flag clothing. Accordingly, they were required to leave school with their parents. (R-52; ER-405; Vol. III [Boden Dep. at 55 at Ex. 4]; R-52; ER-353; Vol. III [Rodriguez Dep. at 120 at Ex. 1]).

## II.    Plaintiffs' Message-Bearing Clothing Caused <u>No</u> Disruption.

On May 5, 2010, the school day at Live Oak High School began as usual, with "zero" period commencing around 7:00 a.m., followed by first period, which began at approximately 8:00 a.m., and then second period, which began at approximately 9:00 a.m. and ended at approximately 10:05 a.m. Second period is the homeroom period, so it has an extra ten minutes added. Following second

period is "brunch break," which runs from approximately 10:05 a.m. to 10:20 a.m. (R-52; ER-390-91; Vol. III [Boden Dep. at 31-32 at Ex. 4]; R-52; ER-327; Vol. III [Rodriguez Dep. at 42 at Ex. 1]).  As noted above, it was during brunch break when Defendant Rodriguez confronted Plaintiffs, demanded that they turn their pro-America shirts inside out, and upon their refusal, directed them to his office. (R-37; ER-463-64; Vol. III [Answer at ¶ 20]; R-52; ER-355-56; Vol. III [Rodriguez Dep. at 125-26 at Ex. 1]).

Prior to restricting Plaintiffs' patriotic message, school officials had <u>no</u> information that Plaintiffs' speech had caused <u>any</u> disruption whatsoever at the school, even though students had been on campus for ***over 3 hours*** and attended at least two classroom periods as well as homeroom.  Defendant Boden testified as follows:

> Q: Did you receive any information that prior to 10:15, that there had been any violence on campus as a result of the clothing that the student plaintiffs were wearing?
> A: No.
> Q: Were you aware of any classes that were changed or canceled as a result of the clothing that the student plaintiffs were wearing?
> A: No.
> Q: So prior to 10:15, is it your understanding that it was a fairly normal school day . . . classes running as scheduled?
> A: Yes.

(R-52; ER-391-92; Vol. III [Boden Dep. at 32-33; *see also* 59 (stating that the school day "went as planned") at Ex. 4]).

Defendant Rodriguez testified similarly:

14

Q: ***Is there anything that you saw [*Plaintiffs*] doing that caused you to believe that they were causing a disruption on the campus at that time?***

A: ***No***.

Q: Prior to your making contact with these student plaintiffs, are you aware if there was any prior class, even zero period, first period, or second period that was cancelled because of any activities that these plaintiffs were involved in?

\* \* \* \*

A: I don't know.

Q: Do you know if there was any class that actually didn't start on time or was disrupted in any way, zero period, first period or second period because of any activities of these plaintiffs that we have been referring to?

A: I don't know.

\* \* \* \*

THE WITNESS:   I don't know that fact.

Q: ***Did anyone tell you, prior to when you first made contact with these plaintiffs during brunch break on May 5th, 2010, that these students were involved in any activity that caused any disruption on the campus?***

A. ***No***.

(R-52; ER-328-29; Vol. III [Rodriguez Dep. at 44-45 (emphasis added); *see also* 84, 121-22 at Ex. 1]).

In sum, Defendants Boden and Rodriguez intentionally restricted Plaintiffs' speech on May 5, 2010, because they believed that the *message* conveyed by Plaintiffs' patriotic clothing would offend some *Mexican* students *since it was Cinco de Mayo* (*i.e.,* "their day").   (R-52; ER-392, 398, 400, 402-03; Vol. III [Boden Dep. at 33, 45, 47, 50-51 at Ex. 4]; R-66; ER-87-88; Vol. II [Smith Dep. At 41-42 at Ex. C]; R-52; ER-427; Vol. III [Smith Dep. at 43 at Ex. 5]; R-52; ER-341-42; Vol. III [Rodriguez Dep. at 88-89 at Ex. 1]).   Defendants enforced the

15

clothing restriction even though they had <u>no</u> objective evidence that Plaintiffs were causing <u>any</u> disruption—let alone a material and substantial one—to the operation of the school.  (R-52; ER-391-92; Vol. III [Boden Dep. at 32-33 at Ex. 4]; R-52; ER-328-29; Vol. III [Rodriguez Dep. at 44-45 at Ex. 1]).

## III.  Defendant Rodriguez Willingly Restricted Plaintiffs' Freedom of Speech.

Defendant Rodriguez willingly assisted, cooperated and agreed with, and carried out the decision to restrict Plaintiffs' speech.   Defendant Rodriguez testified as follows:

> Q: Did you agree with [Defendant Boden's] direction [to have Plaintiffs turn their shirts inside out and/or take them off]?
>                          * * * *
> A: To the extent that I carried out his directions, yes.
>                          * * * *
> Q: Did you ever express to Mr. Boden that you thought this could be violating any of the students' rights?
>                          * * * *
> A: I did not.
> Q: Did you have any concerns that this direction was going to violate any of the students' rights?
> A: No, I did not.

(R-52; ER-338; Vol. III [Rodriguez Dep. at 77 at Ex. 1; *see also* 74-75 at Ex. 1 (testifying that he believed it was a correct decision)]).

## IV.  The 2009 Incident Did Not Justify the Speech Restriction.

While testifying on behalf of the School District, the Superintendent candidly admitted that he "can find no evidence that [the 2009 incident involving

some *Mexican* students] was related to [the 2010 restriction on Plaintiffs' speech]." (R-59; ER-281; Vol. III [Smith Dep. at 35 at Ex. 12]). As the Superintendent testified, "I'm aware of the incidents and can't say with any certainty how one affected the other." (R-59; ER-281-83; Vol. III [Smith Dep. at 35-37 at Ex. 12) ("I think what I said was I couldn't say with any certainty that one was causal of the other.")]).

Nonetheless, the 2009 incident at Live Oak High School provides no lawful justification for the speech restriction at issue here. As Defendant Boden testified, in 2009, a group of "Hispanic" students "paraded around the campus with a Mexican flag" during lunch. (R-59; ER-288-89; Vol. III [Boden Dep. at 29-30 at Ex. 13]). The students were confrontational, which caused approximately "[f]ive minutes" of commotion during the lunch period. (R-59; ER-289; Vol. III [Boden Dep. at 30 at Ex. 13]). No student was disciplined as a result of this incident. No violence occurred as a result of this incident. No classes were canceled as a result of this incident. No classes were delayed or changed in any way as a result of this incident. In fact, the school day began and ended as normal. (R-59; ER-289-90; Vol. III [Boden Dep. at 30-31 at Ex. 13]). Consequently, the 2009 incident itself did not cause a "material and substantial" disruption in the school. Moreover, despite the 2009 incident and Defendants' claim that racial tension exists between American and *Mexican* students at the school, Defendant Boden approved the

Cinco de Mayo activities for May 5, 2010.  (R-52; ER-387-89; Vol. III [Boden Dep. at 25-27 at Ex. 4]).  And to this day, the School District has done nothing to limit these activities on campus.  (R-52; ER-425-26; Vol. III [Smith Dep. at 30-31 at Ex. 5]).

Defendant Rodriguez, who was present during the 2009 incident, was asked to compare the 2009 incident with the 2010 incident, and he testified as follows:

> Q: So the quad area prior to the students coming into your office, ***was there anything that was happening in the quad area, any disruption compared to what happened in 2009***?  Was there anything like that occurring at the point when you directed the students to go to your office?
> A: No.
> Q: Anything like that in 2009?
> A: No.
> Q: So there was no disruption on the campus at that point; is that correct, sir?
> A: Not that I was aware of, as you compared it to 2009.

(R-59; ER-340; Vol. III [Rodriguez Dep. at 84 at Ex. 14]).[7]

---

[7] According to Defendant Rodriguez's testimony, the 2009 incident involved some *Mexican* students draping a Mexican flag over their shoulders—wearing the flag like a cape.  The *Mexican* students were confrontational.  One *Mexican* student began shouting profanities at some of the white students, who responded to the confrontation by stating, "USA, USA."  Defendant Rodriguez brought the *Mexican* student back to his office and counseled him regarding his use of profanity.  The *Mexican* student was not sent home nor disciplined.  (*See* R-59; ER-293-304; Vol. III [Rodriguez Dep. at 60-71 at Ex. 14]).  Defendant Rodriguez testified as follows:
> THE WITNESS:  As I just shared, I pulled minor, first initial J. into my office and had a lengthy conversation with him.
> Q: ***Was that the only action that was taken on behalf of the school district towards these – the students?***
> A: ***To the best of my recollection yes.***

Moreover, as Defendant Boden acknowledged, the American flag is not affiliated with any gangs at the school. (R-59; ER-286-87; Vol. III [Boden Dep. at 23-24 at Ex. 13 (noting that bandanas are prohibited because they are often associated with gangs, but admitting that he is not aware of any gang that affiliates with wearing the American flag bandana)]). Indeed, the gang activity at Live Oak High School involves students with a *Mexican* cultural heritage (*i.e.*, Surenos vs. Nortenos), <u>not</u> Plaintiffs. (*See* R-59; ER-294-95; Vol. III [Rodriguez Dep. at 61-62 at Ex. 14]). Thus, there is no evidence that Plaintiffs have been involved in gang violence or that the American flag is a symbol related to any gang violence in the School District.

## V.     School District Policy and "Guidelines" Authorized the Speech Restriction.

The School District relies on school administrators, such as Defendants Boden and Rodriguez, to enforce the district's policies, rules, regulations, and guidelines within their respective schools. (R-52; ER-416, 420-21; Vol. III [Smith Dep. at 16, 24-25 at Ex. 5];[8] R-52; ER-381-382; Vol. III [Boden Dep. at 15-16 at Ex. 4]; R-52; ER-317; Vol. III [Rodriguez Dep. at 17 at Ex. 1]; R-37; ER-462-63; Vol. III [Answer at ¶¶ 12, 13 (admitting that Defendants Boden and Rodriguez

---

(R-59; ER-302; Vol. III [Rodriguez Dep. at 69 at Ex. 14 (emphasis added)]).

[8] The Superintendent, Dr. Wesley Smith, testified on behalf of the School District pursuant to Fed. R. Civ. P. 30(b)(6). (R-52; ER-414-15; Vol. III [Smith Dep. at 8-9 at Ex. 5]; R-52; ER-441-44; Vol. III [Dep. Ex. 16 at Ex. 6]).

"had the responsibilities of a public employee of the District")]).  This includes the district's "guideline" contained in the "Rights and Responsibilities Handbook for Parents and Students" (hereinafter "Student Handbook") that prohibits the wearing of clothing that is subjectively deemed "disruptive."  (R-52; ER-417, 419, 421-22; Vol. III [Smith Dep. at 19, 22, 25-26 at Ex. 5]; R-52; ER-446-48, 450-52; Vol. III [Dep. Exs. 3, 4 at Exs. 7, 8]; R-52; ER-383, 384-85; Vol. III [Boden Dep. at 17, 20-21 at Ex. 4]; R-52; ER-318-32; Vol. III [Rodriguez Dep. at 25-29 at Ex. 1]). Specifically, the Student Handbook contains a provision within the section entitled "School Rules and Behavior Standards" that states: "*Clothing*, accessories, insignia (such as bandanas/handkerchiefs, earrings, hair designs), or actions which indicate gang affiliation, create a safety hazard, *or disrupt school activities will not be tolerated*.  *Such actions or the wearing and/or possession of these items may be cause for suspension*."  (R-52; ER-418, 419, 422; Vol. III [Smith Dep. at 20, 22, 26 at Ex. 5]; R-52; ER-446-48, 450-52; Vol. III [Dep. Exs. 3, 4 at Exs. 7, 8) (emphasis added)]).  The "School Rules and Behavior Standards" of the Student Handbook set forth a standard of behavior that students at Live Oak High School, including Plaintiffs, were expected to follow on May 5, 2010.  (R-52; ER-385; Vol. III [Boden Dep. at 21 at Ex. 4]; R-52; ER-318-22; Vol. III [Rodriguez Dep. at 25-29 at Ex. 1]).

The School District delegates the authority to enforce this clothing

restriction to its school administrators, such as Defendants Boden and Rodriguez. (R-52; ER-420, 421; Vol. III [Smith Dep. at 24, 25 at Ex. 5]; R-52; ER-383, 384-86; Vol. III [Boden Dep. at 17, 20-22 at Ex. 4]; R-52; ER-322; Vol. III [Rodriguez Dep. at 29 at Ex. 1]).    The School District expects its school administrators to exercise their judgment and discretion when enforcing this restriction.    (R-52; ER-420, 423-25; Vol. III [Smith Dep. at 24, 28-30 at Ex. 5]; R-52; ER-385-86; Vol. III [Boden Dep. at 21-22 at Ex. 4]; R-52; ER-323-24; Vol. III [Rodriguez Dep. at 30-31 at Ex. 1]).    However, the School District does not have any guideline, rule, regulation, or policy that defines what it means to "disrupt school activities."    (R-52; ER-420; Vol. III [Smith Dep. at 24 at Ex. 5]; R-52; ER-385-86; Vol. III [Boden Dep. at 21-22 at Ex. 4]; R-52; ER-323-24; Vol. III [Rodriguez Dep. at 30-31 at Ex. 1]).    That determination is left to the subjective judgment and discretion of the administrator enforcing the restriction.    (R-52; ER-420-21, 423-25; Vol. III [Smith Dep. at 24-25, 28-30 at Ex. 5]).    Similarly, "taking preventive steps . . . is . . . part of the judgment and discretion that is part of the authority given to the principals" in the School District.    (R-52; ER-438-39; Vol. III [Smith Dep. at 69-70 at Ex. 5]; R-52; ER-382; Vol. III [Boden Dep. at 16 at Ex. 4 (acknowledging that he had the authority to take "preventive measures" to avoid anything that might disrupt the educational environment at the school)]; R-52; ER-325-26; Vol. III [Rodriguez Dep. at 37-38 at Ex. 1]).    However, there is no written policy, rule, or regulation

21

that sets forth any criteria to assist a school official in making a decision as to whether it is appropriate to take such preventive measures.[9]  (R-52; ER-438-39; Vol. III [Smith Dep. at 69-70 at Ex. 5]).

The School District's clothing restriction was not officially rescinded, modified, or amended in any way following the May 5, 2010 incident.  (R-52; ER-435; Vol. III [Smith Dep. at 55 at Ex. 5]).  This restriction, which Plaintiffs are subject to, remains in force today as it did on May 5, 2010.  (R-52; ER-428, 435; Vol. III [Smith Dep. at 46, 55 at Ex. 5]).  Indeed, on May 6, 2010, the Superintendent sent a "High" importance email to "All Employee[s]" of the School District regarding the "Patriotic clothing incident" of May 5, 2010.  (R-52; ER-428; Vol. III [Smith Dep. at 46 at Ex. 5]; R-52; ER-456; Vol. III [Dep. Ex. 17 at Ex. 10]).  In that email, the Superintendent, who was specifically referring to the incident involving Plaintiffs, confirmed the following: **"[W]e do not prohibit patriotic clothing _so long as it does not violate our dress code_; therefore, students are not to be disciplined for patriotic clothing _unless said clothing violates our dress code_."**  (R-52; ER-428; Vol. III [Smith Dep. at 46 at Ex. 5]; R-52; ER-456; Vol. III [Dep. Ex. 17 at Ex. 10) (emphasis added)]).  According to the Superintendent, the "dress code" referred to in his email included the restrictions

_____
[9] In its press release, the School District acknowledged that "[s]chool leaders have to make judgment calls on when to take preventive measures to preempt a possible incident or conflict."  (R-52; ER-454; Vol. III [Dep. Ex. 20 at Ex. 9]).

set forth in the Student Handbook.  (R-52; ER-429; Vol. III [Smith Dep. at 47 at Ex. 5]; *see also* R-52; ER-336-37; Vol. III [Rodriguez Dep. at 63-64 at Ex. 1 (acknowledging that the Student Handbook permits school officials to restrict flag clothing that is considered disruptive)]).  In other words, if a school official, based on his or her own subjective judgment and discretion, deems a student's patriotic clothing to be disruptive to the school, without any actual evidence of disruption, the official can take "preventive measures" and prohibit the student from wearing the clothing—which is precisely what happened on May 5, 2010.[10]  As Defendant Rodriguez acknowledged in his testimony, *the restriction on Plaintiffs' patriotic clothing was consistent with the School District's dress code as set forth in the Student Handbook*.  (R-52; ER-336-37; Vol. III [Rodriguez Dep. at 63-64 at Ex. 1]).

Moreover, following the May 5, 2010 incident, the School District did <u>not</u> promulgate any new policies that would secure or protect a student's right to expression on campus in light of the May 5th incident.  (R-52; ER-432; Vol. III [Smith Dep. at 52 at Ex. 5]; *see also* R-52; ER-410; Vol. III [Boden Dep. at 78 at Ex. 4 (acknowledging that he was unaware of any action on the part of the School District "to address the issue of students' free speech rights on campus" following

---

[10] As Defendant Boden admits, the actions he took on May 5, 2010, were taken pursuant to his *official duties* as Principal at Live Oak High School.  (*See* R-12-1; ER-475; Vol. III [Boden Decl. at ¶ 2 (admitting that he took action based on "a duty and obligation [he] understood to be inherent to [his] position as Principal")]).

the May 5, 2010, incident)]).  In fact, the School District does not believe in the first instance that Defendants Boden and Rodriguez violated any student right when they ordered Plaintiffs to remove their patriotic clothing on May 5, 2010. (R-52; ER-430-431; Vol. III [Smith Dep. at 49-50 at Ex. 5]; R-52; ER-409-10; Vol. III [Boden Dep. at 77-78, 80 (finding no need to apologize for his actions) at Ex. 4]; R-52; ER-339; Vol. III [Rodriguez Dep. at 78 (having no concerns that Defendant Boden's "direction was going to violate any of the students' rights") at Ex. 1]).  Indeed, neither Defendant Boden nor Defendant Rodriguez was subject to any adverse employment consequence as a result of their actions on May 5, 2010. (R-52; ER-434; Vol. III [Smith Dep. at 54 at Ex. 5]; R-52; ER-380; Vol. III [Boden Dep. at 14 at Ex. 4]; R-52; ER-348; Vol. III [Rodriguez Dep. at 96 at Ex. 1]).

In sum, the School District has taken no formal policy action that would deter a school official from repeating the offense of May 5, 2010, or protect a student from being subjected to such an offense in the future.  There were no formal changes to board policy that came about as a result of the May 5, 2010, incident—"*None*."  (R-52; ER-435; Vol. III [Smith Dep. at 55 at Ex. 5) (emphasis added)]).  Any claim by the School District that it has "repented" or "reformed" was merely a "talking point" for the press to deflect all of the negative criticism the School District had received from the public.  (*See* R-52; ER-433-35; Vol. III [Smith Dep. at 53-54 at Ex. 5 (referring to Deposition Exhibit 19 and testifying as

follows: "Q: You wanted every employee in the school district to know what [the] district's talking points were with the May 5th, 2010 incident; is that right, sir?  A. Must have.")]; R-52; ER-458; Vol. III [Dep. Ex. 19 at Ex. 11 (setting forth "talking point" claiming that the School District "does not prohibit nor . . . discourage wearing patriotic clothing")]; R-52; ER-408; Vol. III [Boden Dep. at 75 at Ex. 4]; *see also* R-52; ER-436-37; Vol. III [Smith Dep. at 56-57 at Ex. 5 (referring to the "5,000 messages" received "in an eight hour period")]).

In the final analysis, to this day, if Plaintiffs or any other student wore patriotic clothing in any school in the School District—particularly on Cinco de Mayo[11]—and a school official, *based on his or her own subjective judgment and discretion*, believes that the clothing may cause a "disruption" (*i.e.*, the patriotic message may *offend* some students) without evidence of any actual interference with school activities, then the student wearing the clothing is subject to possible suspension.  In other words, there is absolutely nothing preventing a repeat of the May 5, 2010 incident, unless this court grants Plaintiffs' request for declaratory and/or injunctive relief against the School District.

---

[11] The School District has done nothing to limit or restrict the future celebration of Cinco de Mayo in any of its schools, (R-52; ER-425-426; Vol. III [Smith Dep. at 30-31 at Ex. 5]), despite claims that this causes tension between the *Mexican* and American students.

# SUMMARY OF THE ARGUMENT

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), compels reversal of the district court's decision and the granting of Plaintiffs' motion for summary judgment. Contrary to the district court's holding, *Tinker* does not permit government officials to restrict a student's right to freedom of speech based upon an undifferentiated *fear of a disruption*. As *Tinker* makes plain, school officials may not punish a student for the silent, passive expression of opinion that is <u>unaccompanied</u> by any disorder or disturbance *on the part of the speaking student*. And the First Amendment knows no hecklers' veto, even in a school context.

Here, the evidence shows, without contradiction, that Defendants restricted Plaintiffs' passive expression of a pro-America opinion because they feared it would offend certain *Mexican* students on Cinco de Mayo. Defendants do not ban the American flag on any other day because it is a racist symbol or because it is affiliated with gang violence—it is not. Moreover, Defendants have not limited or restricted the future celebration of Cinco de Mayo on School District campuses.

In sum, Defendants have no factual or legal justification for imposing a viewpoint-based restriction—an egregious form of content discrimination—on Plaintiffs' speech in violation of the United States and California Constitutions.

Moreover, because Defendants permitted students to engage in expressive conduct that promoted Cinco de Mayo and a pro-Mexico viewpoint, while prohibiting Plaintiffs' expressive conduct promoting a pro-America viewpoint, Defendants violated the equal protection guarantee of the Fourteenth Amendment. Under the Equal Protection Clause, not to mention the First Amendment itself, the government may not grant the use of a forum to certain views, but deny use to those wishing to express a less favored or more controversial view.

Finally, an additional corollary of the prohibition on viewpoint discrimination is the principle that government officials may not possess unfettered discretion to burden or ban speech, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or the viewpoint of the speaker. Here, the restriction at issue provides no objective standards for enforcement, and it permits punishment for the expression of an unpopular view—indeed, it permits the prior restraint of such views.  As the facts demonstrate, the challenged restriction contains a broad invitation to subjective and discriminatory enforcement in violation of the Due Process Clause of the Fourteenth Amendment.

In the final analysis, in addition to nominal damages, declaratory and injunctive relief are appropriate because Defendants are free to return to their old

ways and, perhaps most important, the public has an interest in having the legality of Defendants' actions settled.

## ARGUMENT

## I.    Standard of Review.

This court reviews an order granting summary judgment de novo, drawing all reasonable inferences supported by the evidence in favor of the non-moving party. *See Porter v. Cal. Dept. of Corrections,* 383 F.3d 1018, 1024 (9th Cir. 2004).

Moreover, because this case involves the violation of First Amendment rights, this court ought to "conduct an independent examination of the record as a whole, without deference to the trial court." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 567 (1995). This is so "because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and [this court] must thus decide for [itself] whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Id.; see also Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984) (noting that in cases raising First Amendment issues appellate courts must make an independent examination of the whole record in order to ensure that lower court decisions do not infringe free speech rights).

28

## II.     Defendants' Speech Restriction Violated the First Amendment.

Defendants do not dispute that the message conveyed by Plaintiffs' patriotic clothing constitutes speech protected by the First Amendment, nor could they.  The Supreme Court has "long recognized that [the First Amendment's] protection does not end at the spoken or written word." *Tx. v. Johnson*, 491 U.S. 397, 404 (1989).  Consequently, wearing message-bearing clothing in a public school is protected by the First Amendment.  *Tinker*, 393 U.S. at 505-06 (holding that the wearing of armbands by students was "closely akin to 'pure speech,' which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment").

### A.     Defendants Restricted Plaintiffs' Speech Based on Its Message.

To determine whether a restriction is content-based, the courts look at whether it "restrict[s] expression because of its message, its ideas, its subject matter, or its content." *Consol. Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980).  Here, there is no dispute that Defendants restricted Plaintiffs' "speech" because it conveyed a pro-America message (*i.e.*, Plaintiffs' clothing depicted the American flag).[12]

---

[12] In case there was any doubt, Defendant Rodriguez testified as follows:
    Q: Just so I'm clear, the five students that were brought from the quad area to your conference room, they were brought there because every one of those students was wearing something that depicted the American flag; isn't that correct?

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992). And the Supreme Court has held time and again that the mere fact that someone might take offense at the content of the speech or the viewpoint of the speaker does not provide a basis for prohibiting the speech. *Johnson*, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975) ("[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer."); *Street v. N.Y.*, 394 US 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *Cohen v. Cal.*, 403 U.S. 15, 26 (1971) ("[W]e cannot indulge the

* * * *

THE WITNESS: Yes.
Q: That was the reason why they were brought to the office, right?
A: Yes.
(R-52; ER-355-56; Vol. III [Rodriguez Dep. at 125-26 at Ex. 1]).

facile assumption that one can forbid particular words [or pictures] without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words [or pictures] as a convenient guise for banning the expression of unpopular views."); *see generally Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

Indeed, a listener's reaction is not a legally sufficient basis for restricting speech. *See Forsyth Cnty. v Nationalist Movement*, 505 U.S. 123, 134-35 (1992) (noting that speech cannot be "punished or banned, simply because it might offend a hostile mob"); *Boos v. Barry*, 485 U.S. 312, 321 (1988) (stating that "[t]he emotive impact of speech on its audience is not a 'secondary effect'" that would permit regulation) (opinion of O'Connor, J.); *Lewis v Wilson,* 253 F3d 1077, 1082 (8th Cir. 2001) ("The [F]irst [A]mendment knows no heckler's veto."). Consequently, the fact that certain student "hecklers" may object to Plaintiffs' silent, passive speech does not license school officials to deny Plaintiffs the right to speak. As this circuit confirmed in a case involving speech <u>in a school context</u>, "There is . . . no precedent for a 'minors' exception to the prohibition on banning speech because of listeners' reaction to its content. It would therefore be an

unprecedented departure from bedrock First Amendment principles to allow the government to restrict speech based on listener reaction simply because the listeners are children." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 790 (9th Cir. 2008).

Moreover, Defendants banned Plaintiffs' political speech not only on the basis of its content, which is impermissible, but on the basis of its *viewpoint*, which is fatal. Indeed, "[v]iewpoint discrimination is . . . an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. When speech "fall[s] within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker." *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003). Thus, viewpoint discrimination occurs when the government "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject," *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985), *as in this case*.

Here, there is no question that Defendants banned Plaintiffs' pro-America viewpoint because they believed it would offend the *Mexican* students who were expressing a pro-Mexico viewpoint. This, Defendants cannot do consistent with the First Amendment.

In sum, Defendants' undifferentiated fear that some *Mexican* students might take offense to Plaintiffs' patriotic, pro-America message and viewpoint provides no basis for restricting Plaintiffs' speech.

### B.     *Tinker* Compels Reversal Below.

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), compels this court to reverse the district court and grant judgment in Plaintiffs' favor.  As the Supreme Court observed in *Tinker*:

> In our system, state-operated schools *may not be enclaves of totalitarianism*.  School officials do not possess absolute authority over their students.  Students in school as well as out of school are "persons" under our Constitution.  They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State.  In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.  They may not be confined to the expression of those sentiments that are officially approved.  In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Id*. at 511 (emphasis added).

In *Tinker*, similar to here, the Court described the "problem posed by the present case" as follows: "The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, *unaccompanied by any disorder or disturbance on the part of petitioners*."  *Id*. at 508 (emphasis added). And similar to this case, the school authorities in *Tinker* sought to defend their actions "based upon their fear of a disturbance from the wearing of the armbands."

*Id.* In finding the speech restriction unconstitutional, the Court rejected the school district's argument and stated the following:

> [I]n our system, undifferentiated fear or apprehension of disturbance is *not enough to overcome the right to freedom of expression*. Any departure from absolute regimentation *may cause trouble*. Any variation from the majority's opinion may inspire fear. *Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance*. <u>*But our Constitution says we must take this risk*</u>, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.
>
> In order for the State <u>*in the person of school officials*</u> to justify prohibition of a particular expression of opinion, it *must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.* Certainly where there is no finding and no showing that engaging in the forbidden conduct would "<u>*materially and substantially* interfere with the requirements of appropriate discipline in the operation of the school</u>," the <u>prohibition cannot be sustained</u>.

*Id.* at 508-09 (emphasis added). *Cf. Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) (distinguishing the speech restriction at issue and stating, "Unlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint").

Here, Defendants Boden and Rodriguez jointly prohibited the expression of a particular opinion without <u>any</u> evidence that the opinion materially and

substantially interfered with the operation of the school.[13]   Rather, they restricted Plaintiffs' speech because they believed that some *Mexican* students on campus would object to Plaintiffs' message because it was Cinco de Mayo—"their day." Indeed, Plaintiffs had been on campus for more than 3 hours prior to being ordered to remove their shirts, and there was no evidence of a "material and substantial" interference at the school.   Moreover, the fact that Defendant Boden permitted three students to return to class (after being detained for 90 minutes, no less) while continuing to wear the initially offending shirts demonstrates that any fear of a "material and substantial" interference was absolutely unfounded.   In fact, aside from the violation of Plaintiffs' fundamental constitutional rights, May 5, 2010 was a relatively normal day at Live Oak High School.

Moreover, despite the School District's "talking points" for the media, <u>existing</u> School District policy and practice continues to permit the suppression of speech based on an undifferentiated fear or apprehension of a disturbance in violation of the First Amendment.  *See Tinker*, 393 U.S. at 508-09.

In the final analysis, Defendants' *repeated* refrain that patriotic clothing, such as the clothing worn by Plaintiffs on May 5, 2010, is not prohibited in the

---

[13] It should be noted that in *Tinker*, there <u>was</u> evidence of "disruption."  The Court noted that while there was "no indication that the work of the schools or any class was disrupted. . . [o]utside the classrooms, a few students made *hostile* remarks to the children wearing armbands, but there were no threats or acts of violence *on school premises*."  *Tinker*, 393 U.S. at 508 (emphasis added).

School District (as opposed to gang affiliated clothing or even Confederate flags, which some deem to be a racist symbol) utterly undermines their claim—and the district court's decision relying solely on that claim—that Plaintiffs' clothing was causing or would reasonably cause a "*material and substantial*" disruption at the school. Defendants can't have it both ways. At the end of the day, it is evident that Defendants wanted to avoid the "discomfort and unpleasantness" that might accompany, for example, a discussion amongst students regarding issues such as illegal immigration. However, as the Supreme Court in *Tinker* made clear, "schools *may not be enclaves of totalitarianism. . . .* [Students] may not be confined to the expression of those sentiments that are officially approved." *Tinker*, 393 U.S. at 511 (emphasis added). Indeed, as the Supreme Court stated decades ago in *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967):

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection."

> Consequently, controlling precedent demands that the government, in the

form of the School District here, produce evidence of a "*material and substantial*" disruption caused by Plaintiffs in order to trump Plaintiffs' fundamental right to freedom of speech. That, the School District cannot do. And the School District's hyperbolic rhetoric about gang problems in the community does not substitute for such evidence. *See A.M. v. Cash*, 585 F.3d 214, 221-22 (5th Cir. 2009) (noting that decisions to restrict student speech must be based "on fact, not intuition").

Moreover, the Confederate flag cases cited by the district court do not alter this conclusion. In each case there was an outright ban on the display of this flag because it was considered by many to be a symbol of racism. *See, e.g., Barr*, 538 F.3d at 554; *but see id*. at 568 ("We caution, however, that our decision today does not establish a precedent justifying a school's ban on student speech *merely* because other students find that speech offensive. . . .").

Here, there is no basis for concluding that the American flag is a racist, offensive, or divisive symbol (nor could there be), and Defendants repeatedly assert that the American flag is not banned from the schools in the School District. Instead, Defendants restricted Plaintiffs' display of the American flag on Cinco de Mayo because some *Mexican* students objected to it since it was "their day." As the Sixth Circuit noted in *Barr* (and as the Supreme Court has repeatedly held, *see supra*) such a restriction on student speech is impermissible. *Id*.

**III.    Defendants' Speech Restriction Violated the California Constitution.**

While article 1, section 2 of the California Constitution generally provides broader protection for the exercise of free speech rights than the First Amendment, *see Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899 (1979), federal law is followed for free speech claims arising in a school setting, *see Cal. Teachers Ass'n v. Governing Bd. of San Diego Unified Sch. Dist.*, 45 Cal. App. 4th 1383, 1391 (1996) ("[W]e find the federal authorities which discuss First Amendment principles in the fairly unique context of school regulation of curricular activities accurately weigh the competing interests of school administrators, teachers and students.").

Thus, for the reasons stated with regard to Plaintiffs' First Amendment claim, Defendants have similarly violated article 1, section 2 of the California Constitution.

**IV.    Defendants' Speech Restriction Violated the Equal Protection Clause.**

"[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *see also Carey v. Brown*, 447 U.S. 455, 461-62 (1980).   Here, Defendants permitted students to hold a Cinco De Mayo celebration on campus

during the school day—a celebration that endorsed and promoted Mexican culture and pride and included "expressive" dancing, among other speech-related activities. Indeed, Defendants did not prohibit those participating in the Mexican celebration from wearing *the colors of the Mexican flag* (*i.e.*, promoting Mexican patriotism). And yet, without any evidence of a material and substantial disruption (in fact, the undisputed evidence shows that Plaintiffs caused <u>no</u> disruption) and based upon the objection of some *Mexican* students (*i.e.*, hecklers), Defendants restricted Plaintiffs' passive, patriotic speech because it endorsed and promoted America. Not only does this restriction violate the Free Speech Clause of the First Amendment, as discussed above, but it violates the equal protection guarantee of the Fourteenth Amendment as well.

## V.    The School District's Speech Restriction "Guidelines" Violate Due Process.

In *Grayned v. City of Rockford*, 408 U.S. 104 (1972), the Supreme Court stated:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. . . . [I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. . . . [And] where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.

*Id*. at 108-09 (internal quotations and punctuation omitted).

In *Grayned*, the Court upheld against a facial challenge[14] an anti-noise ordinance that prohibited a person from engaging in conduct that willfully disturbed school activities because the ordinance did "***not permit punishment for the expression of an unpopular point of view, and it contain***[*ed*] ***no broad invitation to subjective or discriminatory enforcement***."   *Id*. at 113 (emphasis added).   As the Court noted, in order to enforce the ordinance consistent with the Constitution, "there must be demonstrated interference with school activities."   *Id*. at 114.

In this case, the School District's clothing restriction permits the punishment of the expression of a disfavored view without any demonstration that the speech activity actually interfered with school activities (or did anything other than offend some listeners).   Indeed, the School District's "guideline" contains no objective standards and, as the Superintendent's testimony confirmed, it invites subjective and discriminatory enforcement in violation of the Due Process Clause of the Fourteenth Amendment.   *See also Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006) ("A second corollary of the prohibition on viewpoint discrimination is the principle that administrators may not possess unfettered discretion to burden or ban speech, because 'without standards governing the exercise of discretion, a government official may decide who may

---

[14] Unlike this case, the petitioners did not raise an "as applied" challenge, so the Court did not decide that question. *Grayned*, 408 U.S. at 106, n.1.

speak and who may not based upon the content of the speech or viewpoint of the speaker.'") (quoting *City of Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 763-64 (1988)).

In sum, the undisputed evidence shows that the challenged clothing restriction *promulgated by the School District* provides no objective standards or guidelines to enforce its provisions, thereby granting government officials unbridled discretion to silence messages and viewpoints—such as the message and viewpoint expressed by Plaintiffs—that the officials dislike (*i.e.*, messages that government officials believe may cause discomfort or objections from others). Moreover, the challenged restriction permits school officials to engage in a prior restraint of student speech by prohibiting students from wearing message-bearing clothing without any objective evidence that the speech caused or will cause a material and substantial disruption to the school environment in violation of the Constitution. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) (holding that prior restraints on speech carry a heavy presumption against their validity).

In the final analysis, School District policies, practices, and guidelines that permitted the censorship of Plaintiffs' speech on May 5, 2010, still exist today. Consequently, there is <u>nothing</u> (short of a court order) preventing a school official in the future from taking similar "preventive measures" to preempt a *possible*

incident or conflict by prohibiting a student from wearing expressive clothing that the school official, in his or her own *subjective* judgment, deems "disruptive." Such action, which is contrary to the United States and California Constitutions, is permitted by <u>existing</u> School District "guidelines."

## VI. Declaratory and Injunctive Relief Against the School District Are Justified.

Plaintiffs are challenging the School District's clothing restriction both facially and as applied to their expressive conduct on May 5, 2010, as a violation of their right to freedom of speech protected by the United States and California Constitutions and as a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. (R-1; ER-256-58; Vol. III [Compl. at ¶¶ 38-51]). As stated by the Superintendent in direct reference to the May 5, 2010, incident at issue here: "[W]e do not prohibit patriotic clothing *so long as it does not violate our dress code*; therefore, students are not to be disciplined for patriotic clothing *unless said clothing violates our dress code*." (R-52; ER-428; Vol. III [Smith Dep. at 46 at Ex. 5]; R-52; ER-456; Vol. III [Dep. Ex. 17 at Ex. 10) (emphasis added)]). And this "dress code" permits <u>to this day</u> the very conduct that violated Plaintiffs' rights in this case. (R-52; ER-429; Vol. III [Smith Dep. at 47 at Ex. 5 (admitting that the "dress code" includes the restrictions set forth in the Student Handbook)]; R-52; ER-336-37; Vol. III [Rodriguez Dep. at 63-64 at Ex. 1 (acknowledging that the restriction on Plaintiffs' patriotic clothing was consistent with the School

District's dress code)]).  Consequently, the School District should be enjoined from enforcing it in a manner that violates the First Amendment.[15]

When a party seeks to escape liability by claiming that it has voluntarily ceased the offending conduct (or alleges to have done so as part of its "talking points" to the press, as in this case), "the _heavy burden_ of persuading the court that the challenged conduct cannot reasonably be expected to start up again _lies with the party_" seeking to avoid liability.  *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (internal quotations and citation omitted) (italics in original) (emphasis added).  As the Court noted, not only is a defendant "free to return to his old ways," but also the public has an interest "in having the legality of the practices settled."  *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (emphasis

---

[15] While the district court held that the School District has Eleventh Amendment immunity, the fact remains that a claim against a government official in his or her official capacity is a claim against the governmental entity to which he or she is employed (*i.e.,* the School District in this case).  *See Kentucky v. Graham*, 473 U.S. 159 (1985); *see also Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) (holding that "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents").  And such claims for prospective declaratory and injunctive relief are not barred by the Eleventh Amendment.  *See, e.g., Ex Parte Young*, 209 U.S. 123 (1908) (holding that prospective injunctive relief provides an exception to Eleventh Amendment immunity); *Rounds v. Oregon State Bd. of Higher Educ.,* 166 F.3d 1032, 1036 (9th Cir. 1999) ("*Ex Parte Young* provided a narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities."); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (same).  Indeed, by naming the real party in interest in the caption of the case (*i.e.* the School District), along with the responsible official sued in his official capacity, as here, the tax-paying public is aware that the School District is ultimately liable for the unlawful actions.  *Brandon*, 469 U.S. at 471-72.

added); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, n. 10 (1982). Consequently, "[a]long with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *W. T. Grant Co.*, 345 U.S. at 633. Thus, a claim for injunctive relief may be improper only "<u>if the defendant can demonstrate</u> that 'there is no *reasonable expectation* that the wrong will be repeated.' <u>The [defendant's] burden is a heavy one</u>." *Id.* (emphasis added). The Supreme Court has warned the lower courts to be particularly vigilant in cases such as this, stating, "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *Id*. at 632, n. 5. As the Court concluded, denying a plaintiff prospective relief "would be justified only if it were *absolutely clear* that the litigant no longer had any need of the judicial protection that it sought." *Adarand Constructors, Inc.*, 528 U.S. at 224 (emphasis added).

As the undisputed facts demonstrate, <u>*to this day*</u> the School District has in place a "guideline" (*i.e.*, dress code) that permits school officials to prohibit the wearing of patriotic clothing that the officials deem, based upon their own subjective judgment, to be disruptive (*i.e.*, offensive to some students). The restriction is considered by school officials to be a permissible "preventive measure." Yet, there are no objective standards guiding an official's decision to

restrict speech, and there is no requirement that the official demonstrate any actual interference with school activities before doing so.  Indeed, despite the rhetoric and public excuses for the violation of Plaintiffs' constitutional rights, the School District has made <u>no</u> policy changes as a result of the May 5, 2010, incident and insists to this day that no school official violated Plaintiffs' rights.  And despite claims that there is tension between the *Mexican* and American students in the School District, (R-52; ER-345-47; Vol. III [Rodriguez Dep. at 93-95 at Ex. 1]), the School District is doing nothing to prevent future Cinco de Mayo celebrations in the schools, (R-52; ER-425-26; Vol. III [Smith Dep. at 30-31 at Ex. 5]).  Thus, any claim of repentance or reform was purely a "talking point" for the media because there have been no substantive policy changes in the School District that would prevent a repeat of what occurred on May 5, 2010—"<u>None</u>."  (R-52; ER-435; Vol. III [Smith Dep. at 55 at Ex. 5 (emphasis added)]).  Consequently, the School District cannot carry its "heavy burden" to demonstrate that declaratory and injunctive relief are not warranted in this case.

In sum, Defendants have not repealed (nor even amended) their "disruptive clothing" policy.  They have not disavowed (and in fact have reinforced) the authority of school officials to take "*preventive* measures" and prohibit students from wearing "patriotic clothing" to *preempt a possible* disruption—the very authority exercised here that was the source of the constitutional violations.  Thus,

45

as directed by the Supreme Court, this court should (1) reject any "protestations of repentance and reform" as they were made in response to a public controversy and with signs of litigation plainly within their scope and (2) grant Plaintiffs' request for prospective relief because it is absolutely clear that they are in need of the judicial protection they seek.

## CONCLUSION

For the foregoing reasons, this court should reverse the district court and remand with instructions to enter judgment in Plaintiffs' favor as to all claims.

## STATEMENT OF RELATED CASES

Plaintiffs are not aware of any related cases pending in this court.

Respectfully submitted,

THE BECKER LAW FIRM

/s/ William Becker
William Becker, Esq.

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert Joseph Muise, Esq.

THOMAS MORE LAW CENTER

/s/ Erin Mersino
Erin Mersino, Esq.

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(c) and Circuit Rule 32-1, the foregoing Brief is proportionally spaced, has a typeface of 14 points Times New Roman, and contains 11,482 words, excluding those sections identified in Fed. R. App. P. 32(a)(7)(B)(iii).

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq.

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2012, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.  I also certify that all participants in this case are registered CM/ECF users.

I hereby further certify that 4 copies of the Excerpts of Record were sent to the Clerk of the Court via Federal Express and a copy of the Excerpts of Record was served on opposing counsel via Federal Express at the following address:

>Don Willenburg, Esq.
>Mark S. Posard, Esq.
>Alyson S. Cabrera, Esq.
>GORDON & REES LLP
>275 Battery Street, Suite 2000
>San Francisco, CA 94111
>(415) 986-5900
>
>*Counsel for Defendants*
>
>
>AMERICAN FREEDOM LAW CENTER
>
>/s/ Robert J. Muise
>Robert J. Muise, Esq.
>
>*Attorney for Plaintiffs-Appellants*

48