# No. 11-17858

---

# UNITED STATES COURT OF APPEALS
## FOR THE
# NINTH CIRCUIT

---

**JOHN DARIANO**, **DIANNA DARIANO**, ON BEHALF OF THEIR MINOR CHILD, **M.D.**; **KURT FAGERSTROM**, **JULIE ANN FAGERSTROM**, ON BEHALF OF THEIR MINOR CHILD, **D.M.**; **KENDALL JONES**, AND **JOY JONES**, ON BEHALF OF THEIR MINOR CHILD, **D.G.**,

*Plaintiffs-Appellants,*

**V.**

**MORGAN HILL UNIFIED SCHOOL DISTRICT**; **NICK BODEN**, IN HIS OFFICIAL CAPACITY AS PRINCIPAL, LIVE OAK HIGH SCHOOL; AND **MIGUEL RODRIGUEZ**, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY AS ASSISTANT PRINCIPAL, LIVE OAK HIGH SCHOOL,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
HONORABLE JAMES WARE
Case No. CV10-02745 JW

---

## APPELLANTS' REPLY BRIEF

---

WILLIAM J. BECKER, JR., ESQ.
THE BECKER LAW FIRM
11500 OLYMPIC BLVD., STE. 400
LOS ANGELES, CA 90064
(310) 636-1018
*Affiliated Attorney with The Rutherford Institute
and the Thomas More Law Center*

ROBERT J. MUISE, ESQ.
AMERICAN FREEDOM LAW CENTER
P.O. BOX 131098
ANN ARBOR, MI 48113
(734) 635-3756

ERIN MERSINO, ESQ.
THOMAS MORE LAW CENTER
24 FRANK LLOYD WRIGHT DRIVE
P.O. BOX 393
ANN ARBOR, MI 48106
(734) 827-2001

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES .................................................................. ii

STATEMENT IN REPLY ....................................................................... 1

SUMMARY OF MATERIAL FACTS.................................................... 2

ARGUMENT IN REPLY ....................................................................... 9

I.    Defendants' Restriction on Plaintiffs' Silent, Passive, and Non-
      Disruptive Expression of a Pro-America Message Was Viewpoint
      Based—the Most Egregious Form of Content Discrimination ..................... 9

II.   Defendants' Claim that Restricting Plaintiffs' Silent, Passive,
      and Non-Disruptive Expression of Their Pro-America Viewpoint on
      May 5, 2010 Was Necessary to "Prevent Disruption or
      Violence" Is Illegitimate and Should Be Rejected by this Court .................14

III.  Declaratory and Injunctive Relief Against Defendant Rodriguez
      in His *Official Capacity* (*i.e.,* Against the School District) Are Justified .....17

IV.   Defendant Rodriguez Is Not Entitled to Qualified Immunity .......................19

CONCLUSION.....................................................................................21

CERTIFICATE OF COMPLIANCE....................................................22

CERTIFICATE OF SERVICE ............................................................23

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ........................................................................ 20

*Barr v. Lafon*,
    538 F.3d 554 (6th Cir. 2008) ..............................................................10

*Bethel Sch. Dist. v. Fraser*,
    478 U.S. 675 (1986) ...........................................................................10

*Brandon v. Holt*,
    469 U.S. 464 (1985) .....................................................................18, 19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ...........................................................................16

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ...........................................................................19

*Congregation Lubavitch v. City of Cincinnati*,
    997 F.2d 1160 (6th Cir. 1993) ............................................................17

*Consol. Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*,
    447 U.S. 530 (1980) .............................................................................9

*Ctr. For Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*,
    533 F.3d 780 (9th Cir. 2008) ..............................................................12

*Defoe ex rel. Defoe v. Spiva*,
    625538 F.3d 554 (6th Cir. 2008) ........................................................10

*Ex Parte Young*,
    209 U.S. 123 (1908) ...........................................................................18

*Flint v. Dennison*,
    488 F.3d 816 (9th Cir. 2007) ..............................................................18

*Forsyth Cnty. v Nationalist Movement*,
   505 U.S. 123 (1992) ..........................................................................13

*Hall v. Tollett*,
   128 F.3d 418 (6th Cir. 1997) ..........................................................20

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ..........................................................................20

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ..........................................................................10

*Karp v. Becken*,
   477 F.2d 171 (9th Cir. 1973) .....................................................13, 14

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ..........................................................................18

*LaVine v. Blaine Sch. Dist.*,
   257 F.3d 981 (9th Cir. 2001) ..........................................................10

*Lewis v. Wilson*,
   253 F3d 1077 (8th Cir. 2001) ..........................................................13

*Morse v. Frederick*,
   551 U.S. 393 (2007) ..........................................................................10

*Porter v. Cal. Dept. of Corrections*,
   383 F.3d 1018 (9th Cir. 2004) ........................................................11

*Presbyterian Church (U.S.A.) v. United States*,
   870 F.2d 518 (9th Cir. 1989) ..........................................................19

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ............................................................................9

*Rounds v. Oregon State Bd. of Higher Educ.*,
   166 F.3d 1032 (9th Cir. 1999) ........................................................18

*Scott v. Sch. Bd. of Alachua Cnty.*,
   324 F.3d 1246 (11th Cir. 2003) ......................................................10

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) ....................................................................................*passim*

*Tx. v. Johnson,*
  491 U.S. 397 (1989) ...........................................................................13

*West v. Derby Unified Sch. Dist. No. 260*,
  206 F.3d 1358 (10th Cir. 2000) ......................................................10

*W.V. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ..........................................................................2

**Rules**

Fed. R. Civ. P. 30(b)(6)........................................................................6

**STATEMENT IN REPLY**

In a feckless attempt to avoid reversal by this court—a result that is compelled by *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)—Defendants ignore material facts that inconveniently undermine their claimed justification for restricting Plaintiffs' passive, patriotic speech, and they rely on case law that is inapposite. Indeed, there is <u>*no*</u> way to honestly distinguish Plaintiffs' wearing of their American flag shirts to school on Cinco de Mayo with the *Tinker* plaintiffs' wearing of black armbands in protest of the Vietnam War—a contentious and predictably disputatious act on behalf of the *Tinker* students. Indeed, the weakness of Defendants' argument is highlighted by their lengthy reference and quotation to Justice Hugo Black's dissent in *Tinker*. Justice Black's view of the law—one that is shared by Defendants here—was *rejected* by the Supreme Court and must also be *rejected* by this court.

In the final analysis, students <u>*do*</u> possess constitutional rights on a public school campus—a conclusion that can only be changed by the Supreme Court—and the government—in the form of school officials here—must abide by the proscriptions set forth in the First Amendment—proscriptions that are not mere platitudes to be cast aside to avoid discomfort that might accompany competing and contentious political viewpoints. As the Supreme Court emphasized in a case <u>*arising out of a public school context*</u>, "If there is any fixed star in our

constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Defendants' request to have this court anoint them the arbiters of what is and what is not constitutional behavior on their public school campuses must be firmly rejected.

## SUMMARY OF MATERIAL FACTS

As an initial matter and contrary to Defendants' assertion, Plaintiffs *do* challenge the "factual findings" that Defendants rely upon to support their claimed "reasons to believe violence would occur involving students" as a result of Plaintiffs' silent and passive expression of their patriotic viewpoint. (*See* Defs.' Br. at 16). Indeed, the undisputed evidence demonstrates that Defendants' alleged justification for restricting Plaintiffs' speech was illegitimate, as discussed further below.

The following is a summary of the material facts:

- On May 5, 2010, Plaintiffs and two other students wore to school various items of clothing (t-shirts, shorts, shoes) which had depictions of the American flag or American-flag like motifs (*i.e.*, stars and stripes).[1] In sum, Plaintiffs were engaged in the silent and passive expression of a pro-America viewpoint.

- On May 5, 2010, *school officials approved* the *on-campus* celebration of the

---

[1] (R-1; ER-251, 260-66; Vol. III [Compl. at ¶ 14, Exs. 1, 2, 3]; R-37; ER-463; Vol. III [Answer at ¶ 14]).

Mexican holiday known as Cinco de Mayo—a celebration that was co-sponsored by M.E.Ch.A, a school-sanctioned student group that rejects assimilation by Mexicans into American culture and promotes a pro-Mexican culture and heritage.[2]

• The students participating in the Cinco de Mayo celebration _were permitted to wear clothing that had the colors of the Mexican flag_.[3]

• Because Plaintiffs were wearing their American flag shirts to school on Cinco de Mayo, Defendant Rodriguez directed them to turn their shirts inside out.[4]

• Defendants were responding to complaints from some students described by Defendant Rodriguez as "_Mexican American or Mexican students_."[5]

---

[2] (R-52; ER-387-89; Vol. III [Boden Dep. at 25-27 at Ex. 4]; R-52; ER-331-33; Vol. III [Rodriguez Dep. at 54-56 at Ex. 1]; R-52; ER-357-58; Vol. III [Rodriguez Dep. at 159-60 at Ex. 1]; _see also_ R-52; ER-360-75; Vol. III [Dep. Ex. 15 at Ex. 2];R-52; ER-377; Vol. III [Club Charter / Constitution at Ex. 3]).

[3] (R-52; ER-406; Vol. III [Boden Dep. at 57 at Ex. 4 ("Q: Was there any prohibition on any of these dancers that were engaged in these Cinco de Mayo activities from wearing any clothing that had colors of the Mexican flag? A: No.")].

[4] (R-37; ER-463-64; Vol. III [Answer at ¶ 20]).

[5](R-52; ER-392, 402-03; Vol. III [Boden Dep. at 33, 50-51 at Ex. 4]; R-52; ER-330, 333-35, 343-44; Vol. III [Rodriguez Dep. at 50, 56, 57, 59, 90-91 at Ex.1 (emphasis added)]). Plaintiffs italicize "Mexican" throughout their briefs because _that was a distinction made by Defendants_. And contrary to Defendants' assertion (_see_ Defs.' Br. at 11) (noting the highlight but erroneously claiming that "[t]his case is not about a school 'suppressing the American flag'"), Defendant Rodriguez admitted that this case was about "suppressing the American flag," (R-52; ER-355-56; Vol. III [Rodriguez Dep. at 125-26 at Ex. 1]) (admitting that the students were directed to the office because they were wearing American flag shirts). Indeed, Plaintiffs were engaged in _no other behavior or activity_ that drew the attention of

- Plaintiffs were singled out for adverse and discriminatory treatment by Defendants Rodriguez and Boden because they were wearing clothing that depicted the American flag.[6]

- During the meeting that day with Plaintiffs and their parents, Defendants Boden and Rodriguez acknowledged that Plaintiffs' American flag clothing was prohibited because they believed that its message would offend *Mexican* students on campus *since it was Cinco De Mayo*.[7]

  o Defendants claimed during this meeting that Plaintiffs' message was objectionable because "*this is their* [*i.e.,* Mexicans'] *day*," referring to Cinco De Mayo, "*an important day in* [*Mexican*] *culture*."[8]

  o According to Defendants, during this meeting they "*wanted to make sure also that there was an understanding of the importance, the cultural significance of Cinco De May to our Hispanic students*."[9]

  o Defendant Rodriguez testified as follows: "[*T*]*he fact that it was Cinco de Mayo that day, I asked them, 'Why today out of all days?  Why today?*'"[10]

---

school officials other than the fact that they were wearing American flag clothing.

[6] (R-52; ER-393-94, 401-02; Vol. III [Boden Dep. at 40, 41, 49-50 at Ex. 4]; R-52; ER-355-56; Vol. III [Rodriguez Dep. at 125-26 at Ex. 1]).

[7] (R-52; ER-392; Vol. III [Boden Dep. at 33, 50-51 at Ex. 4]; R-52; ER-333-34; Vol. III [Rodriguez Dep. at 56-57, 90-91, *see also* 125-26 at Ex. 1)]).

[8] (R-52; ER-400; Vol. III [Boden Dep. at 47 at Ex. 4] (emphasis added)]).

[9] (R-52; ER-398; Vol. III [Boden Dep. at 45 at Ex. 4] (emphasis added)]).

[10] (R-52; ER-341-42; Vol. III [Rodriguez Dep. at 88-89 at Ex. 1] (emphasis added)]).

- After being detained for over 90 minutes, Plaintiff M.D. and the two non-plaintiff students were permitted to return to class because the American flag depictions on their clothing were not large or "blatant and prominent."[11] Nevertheless, Ms. Dariano removed her son, Plaintiff M.D., from school because she was concerned that the school was creating a pro-Mexican/anti-American atmosphere and that would subject her son to further discrimination.[12]

  o *Defendant Rodriguez warned the returning students to be "respectful" of the Cinco De Mayo activities that were to occur during lunch that day*.[13]

- Because the depiction of the American flag on the clothing worn by Plaintiffs D.M. and D.G was "very, very large," "blatant and prominent," Defendant Boden directed them to change clothing, turn their shirts inside out, cover them up, or go home.[14]  Plaintiffs refused to change or remove their flag

---

[11] (R-52; ER-401-02; Vol. III [Boden Dep. at 49-50 at Ex. 4]; R-52; ER-349-50; Vol. III [Rodriguez Dep. at 111-12 (admitting that "they were allowed to go back because the clothing that they wore ***was not explicitly American flags***") (emphasis added) at Ex. 1]; R-37; ER-464; Vol. III [Answer at ¶ 29]).

[12] (R-26-1; ER-472-73; Vol. III [Dariano Decl. at ¶ 11]; *see also* R-37; ER-465; Vol. III [Answer at ¶ 31]).

[13] (R-52; ER-350-351; Vol. III [Rodriguez Dep. at 112-13 at Ex. 1]).

[14] (R-52; ER-402-03, 404; Vol. III; [Boden Dep. at 50-51, 54 at Ex. 4]; R-52; ER-353, 355-56; Vol. III; [Rodriguez Dep. at 120, 125-26 at Ex. 1]; R-37; ER-464-65; Vol. III [Answer at ¶ 30 ("Defendants admit that Defendant Boden told Plaintiffs D.M. and D.G. that they had to turn their T-shirts inside out or leave school for the day. . . .")]).

clothing. Accordingly, they were required to leave school with their parents.[15]

• Prior to restricting Plaintiffs' pro-America message, school officials had <u>no</u> information that Plaintiffs' speech had caused <u>any</u> disruption whatsoever at the school, even though the students had been on campus for ***over 3 hours*** and attended at least two classroom periods as well as homeroom.[16]

• While testifying on behalf of the School District pursuant to Rule 30(b)(6), the Superintendent candidly admitted that he "can find no evidence that [the 2009 incident involving some *Mexican* students] was related to [the 2010 restriction on Plaintiffs' speech]."[17]

o In 2009, a group of "Hispanic" students "paraded around the campus with a Mexican flag" during lunch.[18]

o The students were confrontational, which caused approximately "[f]ive minutes" of commotion during the lunch period.[19]

o No student was disciplined as a result of this incident. No violence occurred as a result of this incident. No classes were canceled as a result of this

---

[15] (R-52; ER-405; Vol. III [Boden Dep. at 55 at Ex. 4]; R-52; ER-353; Vol. III [Rodriguez Dep. at 120 at Ex. 1]).

[16] (R-52; ER-391-92; Vol. III [Boden Dep. at 32-33; *see also* 59 (stating that the school day "went as planned") at Ex. 4]; R-52; ER-328-29; Vol. III [Rodriguez Dep. at 44-45; *see also* 84, 121-22 at Ex. 1]).

[17] (R-59; ER-281; Vol. III [Smith Dep. at 35 at Ex. 12]; R-59; ER-281-83; Vol. III [Smith Dep. at 35-37 at Ex. 12) ("I think what I said was I couldn't say with any certainty that one was causal of the other.")]).

[18] (R-59; ER-288-89; Vol. III [Boden Dep. at 29-30 at Ex. 13]).

[19] (R-59; ER-289; Vol. III [Boden Dep. at 30 at Ex. 13]).

incident.  No classes were delayed or changed in any way as a result of this incident.  In fact, the school day began and ended as normal.[20]

- Despite the 2009 incident and Defendants' claims of racial tension between American and *Mexican* students, <u>*Defendant Boden approved the Cinco de Mayo activities for May 5, 2010*</u>.[21]

- To this day, the School District has done nothing to limit or restrict the Cinco de Mayo activities on campus.[22]

- Neither the American flag nor its red, white, and blue color scheme is affiliated with any gangs at the school.  Consequently, there is no *per se* restriction on wearing American flag clothing because of purported gang violence.[23]

- The gang activity at Live Oak High School involves students with a *Mexican* cultural heritage (*i.e.*, Surenos vs. Nortenos), <u>not</u> Plaintiffs.[24]

- The Student Handbook contains a provision within the section entitled "School Rules and Behavior Standards" that states: "*Clothing*, accessories, insignia (such as bandanas/handkerchiefs, earrings, hair designs), or actions which indicate gang affiliation, create a safety hazard, *or disrupt school activities will not be tolerated.  Such actions or the wearing and/or possession of these items may be*

---

[20] (R-59; ER-289-90; Vol. III [Boden Dep. at 30-31 at Ex. 13]).
[21] (R-52; ER-387-89; Vol. III [Boden Dep. at 25-27 at Ex. 4]).
[22] (R-52; ER-425-26; Vol. III [Smith Dep. at 30-31 at Ex. 5]).
[23] (R-59; ER-286-87; Vol. III [Boden Dep. at 23-24 at Ex. 13]).
[24] (*See* R-59; ER-294-95; Vol. III [Rodriguez Dep. at 61-62 at Ex. 14]).

*cause for suspension*."[25]

- The "School Rules and Behavior Standards" set forth a standard of behavior that students at Live Oak High School, including Plaintiffs, were expected to follow on May 5, 2010.[26]

- The School District does not have any guideline, rule, regulation, or policy that defines what it means to "disrupt school activities."[27]  That determination is left to the subjective judgment and discretion of the administrator enforcing the restriction.[28]

- The School District's clothing restriction was not officially modified or amended in any way following the May 5, 2010 incident.[29]  It remains in force today as it did on May 5, 2010, permitting a repeat of the May 5th incident.[30]

- On May 6, 2010, the Superintendent sent a "High" importance email to "All Employee[s]" of the School District regarding the "Patriotic clothing incident" of May 5, 2010, and confirmed the application of the clothing restriction to Plaintiffs' patriotic clothing as follows:  *"[W]e do not prohibit patriotic clothing so long as it*

---

[25] (R-52; ER-418, 419, 422; Vol. III [Smith Dep. at 20, 22, 26 at Ex. 5]; R-52; ER-446-48, 450-52; Vol. III [Dep. Exs. 3, 4 at Exs. 7, 8) (emphasis added)]).

[26] (R-52; ER-385; Vol. III [Boden Dep. at 21 at Ex. 4]; R-52; ER-318-22; Vol. III [Rodriguez Dep. at 25-29 at Ex. 1]).

[27] (R-52; ER-420; Vol. III [Smith Dep. at 24 at Ex. 5]; R-52; ER-385-86; Vol. III [Boden Dep. at 21-22 at Ex. 4]; R-52; ER-323-24; Vol. III [Rodriguez Dep. at 30-31 at Ex. 1]).

[28] (R-52; ER-420-21, 423-25; Vol. III [Smith Dep. at 24-25, 28-30 at Ex. 5]).

[29] (R-52; ER-435; Vol. III [Smith Dep. at 55 at Ex. 5]).

[30] (R-52; ER-428, 435; Vol. III [Smith Dep. at 46, 55 at Ex. 5]).

_does not violate our dress code; therefore, students are not to be disciplined for patriotic clothing unless said clothing violates our dress code._"[31]

- The School District has taken no formal policy action that would deter a school official from repeating the offense of May 5, 2010, <u>or</u> protect a student from being subjected to such an offense in the future.  There were <u>no</u> formal changes to board policy that came about as a result of the May 5, 2010, incident— "_None_."[32]

## ARGUMENT IN REPLY

### I.    Defendants' Restriction on Plaintiffs' Silent, Passive, and Non-Disruptive Expression of a Pro-America Message Was Viewpoint Based—the Most Egregious Form of Content Discrimination.

Defendants' restriction on Plaintiffs' speech was not a "reasonable time, place, and manner" restriction, as Defendants suggest.  (_See_ Defs.' Br. at 12). Rather, it was a viewpoint-based restriction, the most egregious form of content discrimination under the First Amendment.  *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Consol. Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980) (noting that a restriction is content based when it "restrict[s] expression because of its message, its ideas, its

---

[31] (R-52; ER-428-29; Vol. III [Smith Dep. at 46, 47 at Ex. 5]; R-52; ER-456; Vol. III [Dep. Ex. 17 at Ex. 10) (emphasis added)]; *see also* R-52; ER-336-37; Vol. III [Rodriguez Dep. at 63-64 at Ex. 1 (acknowledging that the Student Handbook permits school officials to restrict flag clothing that is considered disruptive)]).
[32] (R-52; ER-435; Vol. III [Smith Dep. at 55 at Ex. 5) (emphasis added)]).

subject matter, or its content"). And while some content-based restrictions of student speech might be permissible in the unique circumstances of a school setting, such as restrictions on sexually suggestive or lewd speech,[33] speech advocating illegal drug use,[34] speech that is part of a school-sponsored event,[35] speech that threatens violence,[36] or speech that is considered racist,[37] no such exception exists for the American flag shirts at issue in this case.

Indeed, it is disingenuous to claim that this case is not about "suppressing the American flag." (Defs.' Br. at 11). Without contradiction, _all_ of the evidence shows that Plaintiffs were discriminated against on May 5, 2010 because they wore American flag shirts to school that day (Cinco de Mayo). (*Compare* Defs.' Br. at 35) (claiming that the assertion that Defendants' restriction on Plaintiffs' speech

---

[33] *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 685 (1986) (upholding a restriction on sexually suggestive student speech at a school assembly and distinguishing the speech restriction from the one at issue in *Tinker*, stating, "Unlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint").

[34] *Morse v. Frederick*, 551 U.S. 393 (2007) (restricting speech promoting illegal drug use).

[35] *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) (restricting school-sponsored speech).

[36] *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001) (upholding the school district's discipline of a student who wrote a poem that threatened violence).

[37] *Barr v. Lafon*, 538 F.3d 554, 567 (6th Cir. 2008) (upholding a total ban on the Confederate flag and noting the connection between the "symbolism of the Confederate flag" and "racial tensions"); *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246 (11th Cir. 2003) (same); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000) (same); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010) (same).

was content- and viewpoint-based "is simply made up, and not part of the record"). And lest there remains _any_ doubt about this uncontroverted fact, Defendant Rodriguez removes it when he testified as follows:

> Q: Just so I'm clear, the five students that were brought from the quad area to your conference room, they were brought there _because every one of those students was wearing something that depicted the American flag; isn't that correct_?
>                              * * * *
> THE WITNESS: _Yes_.
> Q: _That was the reason why they were brought to the office, right_?
> A: _Yes_.

(R-52; ER-355-56; Vol. III [Rodriguez Dep. at 125-26 at Ex. 1]) (emphasis added).

Indeed, the evidence, particularly when viewed in a light most favorable to Plaintiffs, as required here, _see Porter v. Cal. Dept. of Corrections,_ 383 F.3d 1018, 1024 (9th Cir. 2004) (requiring the court to draw all reasonable inferences supported by the evidence in favor of the non-moving party when reviewing a grant of summary judgment), compels the conclusion that the speech restriction was viewpoint based. The strongest evidence supporting this conclusion comes from Defendants' very own words and deeds:

- Despite Defendants' hyperbolic claims of racial tension and violence, Defendants authorized the celebration of Cinco de Mayo on campus and permitted those involved in the celebration to wear the colors of the Mexican flag.

- Defendants claimed during the meeting with Plaintiffs and their parents that Plaintiffs' message was objectionable because "_this is their_ [_i.e.,_

11

Mexicans'] *day*," referring to Cinco De Mayo, "*an important day in [Mexican] culture*."

- According to Defendants, during this meeting they "*wanted to make sure also that there was an understanding of the importance, the cultural significance of Cinco De May to our Hispanic students*."

- Defendant Rodriguez testified: "[*T*]*he fact that it was Cinco de Mayo that day, I asked them, 'Why today out of all days?  Why today?*'""

- *Defendant Rodriguez warned the students that were allowed to return to class to be "respectful" of the Cinco De Mayo activities that were to occur during lunch that day*.

In sum, the evidence overwhelmingly supports the conclusion that Defendants restricted Plaintiffs' speech on the basis of its viewpoint (*i.e.*, it was pro-America) because they did not want to offend the Mexican students on campus since it was Cinco de Mayo.

Moreover, Defendants do not—because they cannot—refute Plaintiffs' claim that their speech restriction was a prototypical "heckler's veto," which the First Amendment prohibits *even in a school context*.  *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 790 (9th Cir. 2008) ("There is . . . no precedent for a 'minors' exception to the prohibition on banning speech because of listeners' reaction to its content.  It would therefore be an unprecedented departure

12

from bedrock First Amendment principles to allow the government to restrict speech based on listener reaction simply because the listeners are children."); *see also Tx. v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").  There is no evidence that Plaintiffs did anything but engage in the silent, passive expression of a pro-America viewpoint on May 5, 2010, and any perceived negative response or reaction was from those who opposed this viewpoint—*i.e.*, from the "hecklers."  *See Forsyth Cnty. v Nationalist Movement*, 505 U.S. 123, 134-35 (1992) (noting that speech cannot be "punished or banned, simply because it might offend a hostile mob"); *Lewis v Wilson,* 253 F3d 1077, 1082 (8th Cir. 2001) ("The [F]irst [A]mendment knows no heckler's veto.").

In the final analysis, there is no dispute that the *content* of Plaintiffs' speech is protected by the First Amendment (*i.e.*, it is not one of the categories of speech that can be prohibited in light of the special characteristics of the school environment).  And the *manner* in which Plaintiffs engaged in their speech was nothing short of silent and peaceful (*i.e.*, it was not materially or substantially disruptive).[38]  As the Court noted in *Tinker*, "[T]he wearing of armbands in the

---

[38] *Karp v. Becken*, 477 F.2d 171 (9th Cir. 1973), is of no help to Defendants.  *Karp* is properly viewed as a restriction on the manner of speech (staging a walkout with chanting and signs) that school officials reasonably believed would cause a

13

circumstances of this case was entirely divorced from actually or potentially disruptive conduct *by those participating in it*." *Tinker*, 393 U.S. at 505 (emphasis added). In fact, the Court described the "problem posed by the present case" as follows: "The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, *unaccompanied by any disorder or disturbance on the part of petitioners*." *Id*. at 508 (emphasis).

Similarly here, Defendants "sought to punish [Plaintiffs] for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of [Plaintiffs]." This, Defendants cannot do consistent with the First Amendment.

**II.    Defendants' Claim that Restricting Plaintiffs' Silent, Passive, and Non-Disruptive Expression of Their Pro-America Viewpoint on May 5, 2010 Was Necessary to "Prevent Disruption or Violence" Is Illegitimate and Should Be Rejected by this Court.**

Throughout their brief and in the proceedings below, Defendants claim that they were justified in prohibiting Plaintiffs from wearing American flag shirts to school *on Cinco de Mayo* because they *reasonably* feared that violence would

---

material disruption to the learning environment at the school. Indeed, contrary to the present case, the evidence showed that there was in fact disruption occurring as a result of the student's activity. *Id*. at 173 (noting that students "began chanting, and pushing and shoving"). There is no evidence in *Karp* that school officials were concerned with the content or viewpoint of the message expressed by the plaintiff, as in this case. Indeed, there is nothing in *Karp* remotely similar to what occurred in this case: school officials preventing students from peacefully and silently expressing a pro-America viewpoint through the passive wearing of American flag shirts because some Mexican students objected to the message since they were celebrating "their (Cinco de Mayo) day."

erupt. In their brief, Defendants seek to support their claim by asserting that "[a] near-violent disruption had occurred the prior Cinco de Mayo, *involving the same students* and also over the display of an American flag." (Defs.' Br. at 17) (emphasis added). However, Defendants conveniently avoid noting that (1) in 2009, it was a Mexican student parading a Mexican flag around the campus, wearing it like a cape, and provoking other students (*i.e.*, engaging in speech in a confrontational manner) that caused the American students to respond by hanging a makeshift American flag on a tree; (2) that it was a Mexican student who was threatening to "F**k them white boys, f**k them white boys," and this student was not suspended, directed to go home, or punished in any way by school officials as a result of his threatening and disruptive behavior;[39] and, most important, (3) *that school officials authorized the celebration of Cinco de Mayo on campus on May 5, 2010, despite what allegedly occurred in 2009, and further permitted the Mexican students participating in the celebration to wear the colors of the Mexican flag.* In sum, in light of *all* the facts and circumstances of this case, Defendants' alleged fears are disingenuous and unreasonable.

---

[39] This is an example of "conduct [that] would '*materially and substantially interfere with the requirements of appropriate discipline in the operation of the school*,'" and could thus be prohibited on a public high school campus consistent with the First Amendment. *Tinker*, 393 U.S. at 509. And yet, this student was not punished in any way, nor is there any evidence that he was directed to stay home on May 5, 2010. In fact, the evidence suggests that he was one of the complaining Mexican students. (*See* Defs.' Br. at 17) (noting that the 2010 incident involved the "same students" that were involved in the "near-violent" incident of 2009).

Moreover, there is not a shred of evidence that Plaintiffs were *ever* involved in any gang violence on campus. And there is not a shred of evidence that the American flag was *ever* associated with gang violence—in fact, there was no categorical ban on American flag shirts on May 6, 2010, the very next day, according to the superintendent. Rather, <u>*all*</u> of the evidence of gang violence shows that it was violence *between rival Mexican gangs*.

Finally, Defendants' reliance on incidents that occurred <u>*after*</u> May 5, 2010 to support their speech restriction must be rejected. (*See* Defs.' Br. at 4). Indeed, this controversy became contentious not because Plaintiffs wore American flag shirts to school on Cinco de Mayo—it became contentious because Defendants prohibited them from doing so *<u>in an American public school</u>*. This is evident by the "talking points" issued by the School District, by the number of protest emails received by the School District, and by the superintendent's immediate (and back-peddling) claim that patriotic clothing is not banned in the district's schools. Thus, but for the inane and unconstitutional actions of Defendants on May 5, 2010, it would have been a normal day at Live Oak High School.

In sum, when the government restricts speech protected by the First Amendment but fails to restrict other conduct producing the actual harm alleged, the interest given for the restriction is not legitimate. *See generally Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993);

*Congregation Lubavitch v. City of Cincinnati*, 997 F.2d 1160, 1166 (6th Cir. 1993) ("Because the City is so willing to disregard the traffic problems [by making exceptions], we cannot accept the contention that traffic control is a substantial interest.").

At the very minimum, by allowing the on-campus celebration of Cinco de Mayo and those participating in the celebration to wear the colors of the Mexican flag, Defendants' asserted concerns of potential violence cannot be taken seriously.[40]   Indeed, rather than canceling the potentially violent Mexican celebration (or not approving it in the first instance in light of Defendants' alleged concerns stemming from the Cinco de Mayo events of 2009), which had yet to occur when Defendants directed Plaintiffs to the office, Defendants silenced Plaintiffs and forced them to leave the school in violation of the United States and California Constitutions.

## III. Declaratory and Injunctive Relief Against Defendant Rodriguez in His *Official Capacity* (*i.e.*, Against the School District) Are Justified.

Defendants state that Plaintiffs' opening brief "does not challenge" the district court's ruling that the claims against the School District should be dismissed on the basis of sovereign immunity.  (Defs.' Br. at 12).

---

[40]  It would be similar to a school district authorizing the celebration of "Confederacy Day," but prohibiting students from wearing shirts bearing the image of Martin Luther King for "fear" of disrupting the school campus.

17

As noted throughout the record in this case, Plaintiffs have never sought to recover damages from the School District directly or even indirectly as against a school official in his official capacity. (*See* R-1; Compl.).

And while the district court held that the School District has Eleventh Amendment immunity, the fact remains that a claim against a government official in his or her official capacity *is a claim against the governmental entity to which he or she is employed* (*i.e.,* the School District in this case). *See Kentucky v. Graham*, 473 U.S. 159 (1985). As the U.S. Supreme Court noted in *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985), "[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents."

Moreover, it is well established that requests for prospective declaratory and injunctive relief in the context of such "official capacity" claims are *not* barred by the Eleventh Amendment. *See, e.g., Ex Parte Young*, 209 U.S. 123 (1908) (holding that prospective injunctive relief provides an exception to Eleventh Amendment immunity); *Rounds v. Oregon State Bd. of Higher Educ.,* 166 F.3d 1032, 1036 (9th Cir. 1999) ("*Ex Parte Young* provided a narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities."); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (same).

18

Consequently, by naming the real party in interest in the caption of the case (*i.e.* the School District), along with the responsible officials sued in their official capacities, the tax-paying public is aware that the School District is ultimately liable for the unlawful actions. *Brandon*, 469 U.S. at 471-72. And while this court may change the caption of the case, substantively, any award of declaratory and injunctive relief *will effectively be against the School District*. *See id.*

In sum and as argued more fully in Plaintiffs' opening brief (*see* Pls.' Opening Br. at 39-46), there is nothing preventing Defendant Rodriguez (or any of his successors in office) from repeating the unconstitutional censorship of Plaintiffs' speech. Consequently, this court should grant Plaintiffs' request for prospective relief against Defendant Rodriguez in his official capacity, which effectively enjoins every other School District official that is authorized to engage in similar conduct (*i.e.,* it enjoins the School District), because it is absolutely clear that Plaintiffs are in need of the judicial protection they seek.

## IV.   Defendant Rodriguez Is Not Entitled to Qualified Immunity.

As an initial matter, qualified immunity does not protect a defendant against claims for declaratory and injunctive relief. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (noting that qualified immunity is unavailable "in a suit to enjoin future conduct [or] in an action against a municipality"); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) ("Qualified

immunity . . . does not bar actions for declaratory or injunctive relief."). Also, because Defendant Rodriguez is sued in his official capacity, qualified immunity does not apply. *Hall v. Tollett*, 128 F.3d 418, 430 (6th Cir. 1997) ("Qualified immunity shields defendant from personal liability, but it does not shield him from the claims brought against him in his official capacity.").

Moreover, government officials are protected from personal liability for civil damages only so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Here, Plaintiffs' right to engage in the silent, passive expression of speech promoting their pro-America viewpoint was clearly established on May 5, 2010. *See Tinker*, 393 U.S. at 503. Consequently, Defendant Rodriguez does not enjoy qualified immunity as to Plaintiffs' claim for nominal damages.

20

## CONCLUSION

For the foregoing reasons and for those set forth more fully in Plaintiffs' opening brief, this court should reverse the district court and remand with instructions to enter judgment in Plaintiffs' favor as to all claims.

Respectfully submitted,

THE BECKER LAW FIRM

/s/ William Becker
William Becker, Esq.

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert Joseph Muise, Esq.

THOMAS MORE LAW CENTER

/s/ Erin Mersino
Erin Mersino, Esq.

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(c) and Circuit Rule 32-1, the foregoing Brief is proportionally spaced, has a typeface of 14 points Times New Roman, and contains 5,246 words, excluding those sections identified in Fed. R. App. P. 32(a)(7)(B)(iii).

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq.

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2012, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.  I also certify that all participants in this case are registered CM/ECF users.

AMERICAN FREEDOM LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq.

*Attorney for Plaintiffs-Appellants*